**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Austin HIRST, Bobby Leon Russell, Jimmy Lavon Dozier, David Kim Lockart, Leslie M. Crutchfield, Defendants-Appellants.**

No. 80–5992.

United States Court of Appeals,
Eleventh Circuit.

Feb. 9, 1982.

John F. Daniel, Panama City, Fla., for Hirst and Russell.

Clyde M. Taylor, Jr., Tallahassee, Fla., for Dozier and Lockart.

Robert T. Adams, Jr., Marianna, Fla., for Crutchfield.

David L. McGee, Asst. U. S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before FAY, ANDERSON, and CLARK, Circuit Judges.

CLARK, Circuit Judge:

John Hirst, Bobby Russell, Jimmy Dozier, David Lockart, and Leslie Crutchfield appeal their convictions for conspiracy to possess marijuana with intent to distribute under 21 U.S.C. §§ 841 and 846. We affirm their convictions.

This case arose out of a drug smuggling operation doing business in the Florida Panhandle during 1980. On four instances planeloads of marijuana were landed in Jackson County—three times in small planes and once in a DC–6. This DC–6 smuggling run was intercepted by the authorities and the criminal ring was smashed. The ringleader of these activities was Charles Etheridge, Sr., who has since

testified in cooperation with the government in return for leniency towards his son, who was also involved in the plot.

It should be noted that not all of the defendants took part in all of the plane landings. Nonetheless, all of them worked as part of the offload or ground support crews for these various flights (*e.g.*, Crutchfield, a Florida Game and Fresh Water Fish Commission officer, monitored police radio transmissions in his vehicle). Further, each of the appellants were paid for their efforts and these payments were reflected in a payroll book taken from Charles Etheridge, Sr. when he was arrested. The smuggling ring had been infiltrated by two agents of the Georgia Bureau of Investigation who had direct contact with most of the appellants. Further, several members of the conspiratorial group, other than Charles Etheridge, Sr., admitted their roles in the crime and testified on behalf of the prosecution.

The appellants advance several grounds which they contend require the reversal of their convictions. We turn first to their sixth amendment claims.

The appellants claim that the trial court unduly limited their opportunity to cross-examine several of the prosecution witnesses and that this limitation constituted a violation of their sixth amendment right to confrontation. Charles Etheridge, Sr. testified against the appellants. During cross-examination, Etheridge had his fifth amendment rights invoked by the prosecuting attorney and by his own lawyer when asked about his prior drug dealings.

The reason that the appellants' attorneys sought information about Etheridge's prior drug dealings was not to impeach his testimony on that basis. Etheridge had already admitted that he was cooperating with the government in order that his son might receive a lighter sentence and had admitted to prior convictions in drug deals. Rather, we quote from the appellants' brief as to why this question was posed:

The request for information as to Ethridge [*sic*] Sr's., prior drug involvement was even more specific then [*sic*] the general allegations of bias, prejudice, or motive. At one point in cross-examination, Charles Ethridge [*sic*] Sr., testified that a sample of marijuana had been given to Geno Bianchetti and that the sample in a brown paper bag consisted of a pound. (TR–838–39). Cross-examination was then conducted as to what a pound of marijuana would look like. (TR–839). In particular, Ethridge [*sic*] Sr., testified that he never had seen a pound of marijuana before. (TR–839). He also testified that his recollection could not be off and that it was in fact a pound of marijuana which had been delivered to Bianchetti. (TR–839–40). It was immediately thereafter in an attempt to impeach Ethridge [*sic*] Sr., as to his estimate of marijuana weight that the question was posed as to prior marijuana dealings. (TR–841). Thus, the question posed was directly related to the witness's expertise and ability to estimate marijuana weights and to impeachment of his estimates. (TR–842).

This ability to impeach Charles Ethridge [*sic*] Sr., was particularly important since the two immediately proceeding [*sic*] witnesses testified as to the sample of marijuana which had been received by Geno Bianchetti. In particular, James Ward of the Alabama Public Safety Department testified that the sample weighed only one ounce was was [*sic*] contained in a plastic baggie. (TR–773, 779). This is in direct contradiction to Ethridge [*sic*] Sr's., testimony of being one pound in a brown paper bag. (TR–839–40). Thus, the clear discrepany [*sic*] between the testimony offered by Charles Ethridge [*sic*] Sr., and that offered by Alabama Public Safety Department Officer James Ward was fair grounds for cross-examination. And Ethridge [*sic*] Sr's., prior involvement in marijuana dealings and his expertise in the area would clearly establish perjury on his part, as opposed to mere miscalculation.

Brief for Appellants Hirst, Russell, Dozier, and Lockart at 15–16. Even the *most* cursory glance at the record emphasizes the

pointlessness of this contention. The witness Etheridge clearly states that he was not sure precisely how much marijuana he gave to Bianchetti and that he had never seen a pound of marijuana *in a bag before.* We quote from the record:

Q. Incidentally, did you give this fellow—this used-car dealer guy Geno any marijuana?

A. Yes sir.

Q. What did you give him?

A. Give him some marijuana.

Q. Well, how much did you give him?

A. I don't know sir. He put it in a paper bag, maybe a pound.

Q. All right. And is that the day of April 21 when you were at Butch Hirst's house?

A. Yes sir.

Q. And you gave him a batch of marijuana and he put it in a paper bag?

A. That is correct.

Q. A brown paper bag?

A. Yes, sir.

Q. It wasn't a little clear plastic Glad bag was it?

A. It could have been, sir. I don't remember exactly. It was a bag.

Q. All right. And how much is a pound? How much does a pound look like in—for the ladies and gentlemen of the jury, tell them how much a pound of marijuana looks like.

A. I don't know.

Q. You've never seen a pound before?

A. In a bag? No, sir.

Q. Didn't you take something out and give it to him or give him some marijuana?

A. Yes, sir. When I said a pound, maybe I should have said a handful or two. I don't know what a pound is other than 16 ounces.

Q. All right. But 16 ounces makes a pound.

A. That is correct.

Q. You don't think you could be off in your recollection and only have given him a little ounce, could you?

A. No, sir.

Q. You gave him more than an ounce, didn't you?

A. Well, I give him a couple of handfuls there, what we got out of the bag. Now, if we get a couple of handfuls here and weigh them if you want and—

Q. You gave him more than an ounce, didn't you?

A. I give him a couple of handfuls, sir. I don't know how much. I assume its a pound.

Record at 838–40. This demonstrates that Etheridge had given out several handfuls of marijuana and was unsure of its weight. It also demonstrates that there is no validity to the appellants' contention that the invocation of the fifth amendment for Etheridge deprived them of the opportunity to prove that he had perjured himself. Further, details of Etheridge's prior drug transactions were totally irrelevant. He had dealt with marijuana by the ton, not by the pound or ounce.

■ The fifth amendment was claimed for Etheridge in a very unorthodox fashion. Clearly, the prosecutor should have objected to the questions regarding Etheridge's prior criminal activities on the basis of relevancy and materiality. However, in spite of this the appellants were not harmed. Even assuming *arguendo* that there was some merit in the appellants' strategy, the trial judge ruled correctly on the matter. Here, the privilege was invoked as to purely collateral matters which dealt only with the credibility of the witness. Unlike the situation in which the assertion of the privilege prevents inquiry into matters brought out on direct examination, it was proper in the instant case to respect the privilege and to allow Etheridge's testimony into evidence. *Fountain v. United States*, 384 F.2d 624 (5th Cir. 1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); see *also United States v. Brown*, 634 F.2d 819 (5th Cir. 1981); *United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963).

■ The appellants also claim that their sixth amendment rights were violated in a number of other situations that arose during the trial. These included the refusal of the trial court to allow inquiry into a confidential informant's continuing and future undercover work for the government, the trial court's refusal to allow questioning of a Georgia Bureau of Investigation agent into a continuing investigation, and the trial court's refusal to allow inquiry into collateral events taking place in Costa Rica during the cross-examination of Charles Etheridge, Sr. We have examined the record on all these points and disagree with the appellants. The permissible extent of cross-examination is left to the sound discretion of the trial court. *United States v. Contreras*, 602 F.2d 1237 (5th Cir. 1979), *cert. denied*, 444 U.S. 971, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979). We find that the trial judge did not abuse his discretion. To permit defense counsel to elicit detailed facts about a witness' past criminal activity in unrelated crimes could impair the government's investigation and trial of criminal cases involving that activity. Absent relevancy to the issue being tried and harm to the defendant by disallowing such evidence, its exclusion is not error.

The refusal of the court below to allow inquiry into the confidential informant's continuing investigative activities was amply warranted. It had already been established that the informant had been convicted but not yet sentenced in Hendry County, Florida, for drug offenses and that he had been previously arrested in Georgia for drug importation. Nothing could have been brought out on cross-examination to impeach him further. Likewise, the Georgia Bureau of Investigation agent was questioned about the activities of this confidential informant in ongoing cases. For the same reasons, the trial court did not abuse its discretion in limiting cross-examination of him. Lastly, the trial judge did not abuse his discretion in ruling irrelevant certain questions during the cross-examination of Charles Etheridge, Sr. regarding his adventures in Costa Rica prior to bringing the DC–6 to Florida. Although, like his

shootout with the Colombian army in the Amazon jungle, Etheridge's Costa Rican sojourn would no doubt have made interesting reading, it had precious little relevancy to the issues at trial. Therefore, the appellants have failed to establish that their sixth amendment rights were violated.

■ Next, the appellants contend that the trial court failed to instruct properly the jury on conspiracy. The trial court instructed the jury that the evidence must show beyond a reasonable doubt that a conspiracy did exist and that "the defendant, each individual defendant, willfully became a member of such conspiracy." This instruction complies with the requirements of *United States v. Malatesta*, 590 F.2d 1379 (5th Cir. 1979), *cert. denied*, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979), and therefore the trial judge committed no error.

■ The appellants also raise the contention that the trial judge erred by not instructing the jury on a lesser included offense, conspiracy to possess marijuana. There is no merit to this contention. The evidence presented during the trial indicated that the defendants dealt with thousands of pounds of marijuana. Because of the large quantities involved, thereby making it inconceivable that the smuggled marijuana was intended for the appellants' personal consumption, it was unnecessary to instruct the jury on the lesser included offense. *United States v. Rogers*, 504 F.2d 1079 (5th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2655, 44 L.Ed.2d 85 (1975); *United States v. Henley*, 502 F.2d 585 (5th Cir. 1974).

■ Appellant Lockart claims that he should have been granted a severance because the evidence proved three conspiracies and he was involved only in one of them. If this were true, Lockart would be entitled to have his conviction reversed. However, we decline to view the evidence in this light. Charles Etheridge, Sr. was the mastermind behind all of the flights. Several individuals testified that all the flights were part of a common plan to im-

port marijuana into the United States. Flights were made on a regular basis and they involved a significant continuity of membership. Indeed, all the individuals involved in the final DC–6 flight (except Lockart) had been involved in one of the prior flights. Unlike the factual situation in *United States v. Durades*, 607 F.2d 818 (9th Cir. 1979), there was no break in the conspiracy's business or a major change of characters. Thus, *Durades* is inapposite here. What happened in the instant case is that Lockart became involved in the conspiracy immediately before it was broken up but after he committed certain overt acts in furtherance of it. It was unfortunate timing from his point of view, but he is no less guilty of conspiracy to possess marijuana with intent to distribute than his compatriots. Therefore, we hold that his motion for a severance was properly denied.

Appellant Crutchfield maintains that he is entitled to a new trial because of newly discovered evidence. Specifically, the evidence is a memo from the Drug Enforcement Administration to a witness, asking the witness to assist in the investigation. The memo was dated February 28, 1980. The witness had testified at trial that he had first been contacted by the defendants on March 20, 1980. Crutchfield contends that if he had possessed this information he could have pointed out the discrepancy between the memo and the witness's testimony, and thereby would have been able to discredit the witness.

We reject this contention. It is not clear that the new evidence contradicts the witness's trial testimony. Even if it did, newly discovered impeaching evidence does not justify a new trial under *United States v. Johnson*, 596 F.2d 147 (5th Cir. 1979). Newly discovered evidence must be material and the question of materiality rests in the discretion of the court. *United States v. Atkins*, 545 F.2d 1153 (8th Cir. 1976). Additionally, under *Johnson*, not only must the evidence be material, but it also must be likely to produce an acquittal of the defendant. Given the overwhelming nature of the evidence against Crutchfield

(five witnesses had identified him as a conspirator), this standard could not have been met. Therefore, we hold that Crutchfield was properly denied a new trial.

Lastly, appellant Crutchfield maintains that the district court erred in limiting his time for summation before the jury to thirty minutes. We reject this contention. Under *United States v. Bernes*, 602 F.2d 716 (5th Cir. 1979), the period of time for an attorney's closing argument is within the discretion of the district judge. The government was allotted two hours for its closing argument, while the defendants were given a total of three hours and thirty minutes for theirs (one-half hour apiece). We find that the district judge did not abuse his discretion.

Therefore, we have examined and rejected appellants' contentions. Since none of their arguments have any merit, their convictions are affirmed.

AFFIRMED.