**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**J.R. "Buddy" CARTER, Joy Carter,**
**Kevin Sheehy, William M. "Billy"**
**Butts, Defendants-Appellants.**

**No. 83–3533.**

United States Court of Appeals,
Eleventh Circuit.

May 28, 1985.

Bruce Rogow, Ft. Lauderdale, Fla., for Joy Carter.

Richard Hersch, Barry J. Siegel, South Miami, Fla., for Kevin Sheehy.

Karen Berkowitz, Tampa, Fla., for William Butts.

Bruce J. Ennis, Kit Kinports, Washington, D.C., for J.R. Carter.

Lynn Cole, Asst. U.S. Atty., Tampa, Fla., Kathleen A. Felton, Crim. Div., Appellate Section, Washington, D.C., for plaintiff-appellee.

Before FAY and JOHNSON, Circuit Judges, and DYER, Senior Circuit Judge.

FAY, Circuit Judge:

On July 9, 1981, United States Customs officials in Miami monitored and pursued a suspicious airplane as it made its way from the Bahamas into the United States. The plane eventually landed on a secluded grass airstrip along Florida's west coast. Federal agents quickly converged on the scene, but by the time they arrived, the suspects had fled. The agents did, however, find evidence of marijuana aboard the abandoned plane. Following a lengthy investigation, five suspects were indicted on federal drug charges. They were tried jointly and four of the five were convicted in a jury trial in federal district court. On appeal, defendants argue that: (1) the trial court erred in not granting defendants' motions for severance; (2) the agents' warrantless search of the plane was not a valid border search and the items seized were therefore inadmissible; (3) the trial court erred in not granting a mistrial on account of a government witness' reference to defendant Sheehy's prearrest silence; (4) the prosecutor improperly commented on defendant Sheehy's election not to take the stand; (5) the trial court erroneously admitted extrinsic offense evidence and co-conspirator statements; (6) the district court abused its discretion in restricting cross-examination and in limiting the time allowed for closing arguments; (7) there was insufficient evidence to support appellants' convictions; and (8) the trial court improperly relied on *ex parte* material in imposing sentence. We have reviewed these arguments and have found no grounds for reversal. Appellants' convictions are, therefore, affirmed.

## I. FACTS

In the early evening of July 9, 1981, U.S. Customs officers at the Customs Command Control Center in Miami detected on radar a suspicious aircraft heading in the direction of the United States. At the time it was detected, the aircraft was located approximately twenty-seven miles northwest

of Bimini and was on a course for southern Florida. The plane was not sending out a transponder signal,[1] and no flight plan had been filed in the United States.

Customs officers continued to track the plane as it headed toward the United States. When the aircraft passed within the twelve-mile territorial limit, Customs supervisors gave the order to scramble. Two Customs aircraft, a Citation jet referred to as Omaha 52, and a twin engine plane, Omaha 17, took off to intercept the suspect aircraft. The Command Center designated this suspicious plane Suspect 13.

The Citation jet, Omaha 52, quickly intercepted Suspect 13 as it made its way across southern Florida. Omaha 17 was close behind. According to the crew of Omaha 52, Suspect 13 was flying with its visual and landing lights off. Omaha 52 got close enough to Suspect 13 to get its tail number and identify it as a Cessna Skymaster 337 Push-Pull aircraft. The Customs jet then dropped back to continue following. As Suspect 13 approached the west coast of Florida, it began to make its descent into a rural area just south of Ft. Myers known as Corkscrew.

It was just getting dark as Suspect 13 made its landing on a secluded, unlit, grass airstrip. The crew of Omaha 52 watched from the air and could see two vehicles waiting for the plane at the end of the runway. As the plane landed, the vehicles had their headlights on and were facing each other. When the plane came to a stop between them, the lights went out.

The pilot of Omaha 52 considered landing directly behind Suspect 13, but realized that the short grass runway would not accommodate the small jet. It was decided that Omaha 17, now on the scene, would attempt to land. The twin engine plane made its approach and was just fifty feet above the airstrip when its lights illuminated a horse trailer which had been placed in the middle of the runway. The pilot quickly pulled up, narrowly averting disaster, and decided against any further attempt at landing.

Unable to land, Omaha 17 and Omaha 52 circled overhead while awaiting the arrival of a helicopter carrying armed Customs agents. During their wait, and with the aid of night vision equipment, the crew of Omaha 17 was able to observe several vehicles in the vicinity of the suspect aircraft. They could not tell, however, whether the aircraft was being unloaded. The Customs agents continued to watch as the two vehicles left the landing strip heading in opposite directions.

A short time thereafter, the Customs helicopter arrived. Omaha 52 directed the helicopter in along with ground units from the DEA and the Collins and Lee County Sheriff's Departments. One of the Sheriff's units responding to the call stopped a car which was coming from the direction of the airstrip. After briefly detaining the driver, Joy Carter, the deputies allowed her to leave. Customs officials would later learn that Joy Carter and her husband, Buddy, were primary suspects in the smuggling operation.[2]

When the Customs helicopter landed, the agents immediately approached Suspect 13 and found its doors locked. The Cessna appeared empty. There were no other vehicles or persons present. A search of the outer perimeter was immediately undertaken. Finding nothing, the agents re-

1. A transponder is an electronic device found on most aircraft which transmits a signal to a radar center, thereby aiding air traffic controllers in their efforts to monitor and identify various aircraft. While it is not required under all circumstances, it is generally considered good safety practice to operate the transponder while in flight.

2. Evidence contained in the record indicates that Joy Carter radioed her cohorts in the Cessna and warned them that Customs planes were behind them. It was also revealed that she told a government witness that she was responsible for placing the horse trailer in the middle of the runway in order to prevent the Customs planes from landing. A subsequent check of the horse trailer's registration revealed that the trailer was in fact owned by Joy Carter and her husband Buddy.

turned to the Cessna and managed to unlock the doors. Once the doors were open, the agents noticed the strong odor of marijuana coming from within. Small particles of what appeared to be marijuana were collected from inside the plane and a field test for the substance yielded positive results.

While the airport search continued, another group of agents drove down a nearby road in search of a vehicle which Omaha 17 had reported leaving the scene. The agents soon came upon an abandoned vehicle which was off the road and stuck in the sand. A set of footprints led from the driver's side into the underbrush. The agents followed the tracks approximately one mile when they came upon a woman who identified herself as Maryann Best. Best was sitting huddled on an abandoned piece of machinery and told the agents that she had been horseback riding. The agents decided to escort her back to the airfield for further questioning.

Meanwhile, back at the airstrip, the federal agents' search of the suspect aircraft continued. In addition to the traces of marijuana, a passport was discovered belonging to a Kevin Sheehy. The agents also found a bottle of insulin, some syringes, a Bahamas Flight Planning Chart, and a Jamaican road map. A certificate of aircraft registration was also discovered inside the plane and it revealed that the Cessna was owned by a Buddy Carter. The officers noticed, however, that the identification numbers painted on the plane were different from those listed on the certificate of registration. Upon closer observation, the officers discovered that portions of the tail numbers had been covered and altered with tape, and that with the tape removed, the numbers on the plane and the numbers on the certificate were indeed identical.

Approximately one hundred feet from where the Cessna had stopped stood a stilt house. When Maryann Best was brought back to the airstrip, she told the Customs agents that she and her boyfriend, William Butts, had been staying in the house and

that the house belonged to Kevin Sheehy, the same individual whose passport had been found inside the plane. She further told the agents that they had a U-Haul and a jeep which they planned to use to move furniture. Neither the jeep nor the U-Haul were anywhere in sight, but tire tracks were evident around and between the house and the plane. There were also three sets of footprints near the plane. Agents testified that two of the sets of prints appeared to have been made by males, and the third set of prints by a female.

While searching the crime scene, the agents noticed that the door to the stilt house was open and that no one appeared to be inside. They entered the house and found two purses. One purse belonged to Maryann Best, whom the agents had just found hiding in the woods, and the other to Joy Carter, who was stopped earlier by sheriff's deputies as she drove away from the Corkscrew airstrip. Inside Best's purse, the agents found a rental contract for the U-Haul trailer.

The investigation continued for several months. Among other things, the agents learned that the horse trailer that was placed on the runway belonged to Buddy Carter, the owner of the plane. In addition, the agents' persistence eventually led them to Jeffrey Martin, an alleged accomplice who agreed to cooperate with the government. Martin told the agents that on the evening in question, at approximately 2:00 a.m., he received a telephone call from his friend Buddy Carter. Carter told Martin that he was calling from the Corkscrew General Store, that he had had some trouble, and that he needed a ride. Martin said that he drove to the store, which is adjacent to the airstrip, to pick up Carter. Carter emerged from the woods, got into Martin's car, and the two of them proceeded down the road with the car lights off. According to Martin, they drove a short distance down the road and picked up two more men—William Butts and Kevin Sheehy.

Martin told the agents that Carter asked to be taken to Ft. Myers Airport where his truck was parked. On the way, Carter told Martin how they had offloaded the marijuana before Customs arrived and hit it in the palmettos. Carter also told Martin that they used Sheehy's jeep and the U-Haul trailer for the task. Finally, Martin stated that several weeks after the midnight rendezvous, he rented a warehouse under a false name for Carter and that the offloaded marijuana was eventually moved to the warehouse and sold.

## II. THE TRIAL

Following a lengthy investigation, Buddy Carter, Kevin Sheehy, William Butts, Joy Carter and Maryann Best were indicted and tried jointly before a jury in the United States District Court for the Middle District of Florida. Buddy Carter, Sheehy and Butts were convicted of conspiracy to import marijuana and importation of marijuana. In addition, Buddy Carter was also convicted of conspiracy to possess marijuana with intent to distribute, and possession of marijuana with intent to distribute. Joy Carter was convicted only on the importation of marijuana charge. Maryann Best's motion for a judgment of acquittal was granted at the close of the government's case.

## III. DENIAL OF MOTION FOR SEVERANCE

The instant case involved five defendants all charged in a single indictment. Two of the defendants, Buddy Carter and Kevin Sheehy, filed a Notice of Alibi Defense and argued accordingly at trial. The three remaining defendants, William Butts, Maryann Best and Joy Carter, asserted a mere presence defense. Throughout the trial, numerous motions for severance were made on the basis that the two defenses, alibi and mere presence, were mutually exclusive and irreconcilable, and that the de-

fendants were therefore unduly prejudiced. On appeal, appellants argue that the district court's refusal to grant the severance motions constituted error. We disagree.

 In order to justify severance due to conflicting defenses, a defendant must demonstrate that the defenses are antagonistic to the point of being mutually exclusive or irreconcilable. *United States v. Esle,* 743 F.2d 1465, 1476 (11th Cir.1984); *United States v. Stephenson,* 708 F.2d 580, 582 (11th Cir.1983); *United States v. Capo,* 693 F.2d 1330, 1335 (11th Cir.1982), *aff'd on rehearing,* 716 F.2d 1355 (1983), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983); *United States v. Berkowitz,* 662 F.2d 1127, 1133 (5th Cir. Unit B 1981).[3] Under Fed.R.Crim.P. 14, the decision to grant a severance is committed to the sound discretion of the trial court and will not be disturbed absent a clear showing of abuse. *Esle,* 743 F.2d at 1476; *United States v. Pirolli,* 742 F.2d 1382, 1385 (11th Cir.1984); *United States v. Archer,* 733 F.2d 354, 360 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 196, 83 L.Ed.2d 128 (1984); *Berkowitz,* 662 F.2d at 1132. To establish an abuse of discretion, a defendant must show that denial of the severance caused him to suffer specific and *compelling* prejudice. *Pirolli,* 742 F.2d at 1386; *Archer,* 733 F.2d at 360; *Capo,* 693 F.2d at 1335; *Berkowitz,* 662 F.2d at 1134.

At trial, defendants Buddy Carter and Sheehy presented an alibi defense to the effect that they were in Islamorada, Florida when the alleged events took place. The government, on the other hand, sought to establish their presence at the crime scene through the testimony of their chief witness, Jeffrey Martin. Martin testified on direct examination that he picked up Carter, Sheehy and Butts near the Corkscrew airfield on the night the plane landed. According to appellants, it was during the subsequent cross-examination of Mar-

---

3. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981. We are likewise bound by Unit B decisions of the former Fifth Circuit handed down after October 1, 1981. *Stein v. Reynolds Secs., Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

tin by defense attorneys that the alleged conflicts in defense strategies became apparent.

Specifically, appellants point to the cross-examination of Martin by Jeffrey Miller, attorney for William Butts, as exemplifying just how irreconcilable the two defenses are. In order to support his theory that Butts was present but not involved, Miller sought to emphasize on cross-examination that Carter and Sheehy were not only present that night, but were also in fact the masterminds of the whole scheme. This position is of course contrary to that of co-defendants Carter and Sheehy who claim that they were not anywhere near the Corkscrew airfield.

 As previously stated, the burden is on the defendants to show that their defenses are antagonistic to the point of being mutually exclusive or irreconcilable. While we agree that the two defense positions are somewhat antagonistic in regard to this witness' testimony, we do not believe that they are antagonistic to the point that severance was required. In *Berkowitz*, 662 F.2d at 1134, the court noted that the test "goes further than merely examining whether a defendant is subjected to a co-defendants ... adverse cross-examinations, which might occur in every case of antagonistic, but not mutually exclusive, defenses." The test for antagonism sufficient for severance was set forth in *Berkowitz* as follows:

> if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant[s].

*Id.; see Esle*, 743 F.2d at 1476.

This court has on previous occasions considered the question of whether an alibi and a mere presence defense were antagonistic to the point of requiring a severance. In *Stephenson*, 708 F.2d 580, two men were accused of stealing a purse from an FBI agent engaged in the official performance of her duties, and with assault on that agent. One defendant presented an alibi defense; the other testified that he was present but that he did not participate in or know about the robbery and assault. In *Stephenson*, we held that the alibi and mere presence defenses were not mutually exclusive or irreconcilable, and that the jury could have believed both defendants' theories of defense. *Id.* at 582. The same can be said in the instant case. When several individuals are accused of participating in a drug smuggling operation, we see no reason why a jury cannot conclude that some of the accused were not even present, and that those who were present were not involved. The fact that such a conclusion is not likely in this case is due not to the irreconcilable nature of the defenses, but rather to the significant amount of evidence adduced against appellants.

We are further influenced by the fact that in the instant case, not one of the defendants took the stand. In this respect, this case is markedly different from those situations where one or more co-defendants take the stand and attempt to put the blame on each other. *See, e.g., Stephenson*, 708 F.2d 580; *Berkowitz*, 662 F.2d 1127. Clearly this latter situation is far more prejudicial to the defendants than where, as in this case, the testimony elicited from a government witness on cross-examination does not serve each co-defendant's individual interests. In dealing with antagonistic defenses, the court is particularly wary of the situation where "co-defendants do indeed become the government's best witnesses against each other." *Id.* at 1134. That clearly is not the situation here, and we doubt seriously that the jury unjustifiably inferred the defendants' guilt from the mere fact that each attorney's cross-examination of a particular government witness was not mutually beneficial for all the co-defendants.

Furthermore, to prevail on their claim that a severance should have been granted, appellants bear the heavy burden of proving that they suffered specific and *compelling* prejudice. *Pirolli*, 742 F.2d at 1386; *Archer*, 733 F.2d at 360; *Capo*, 693 F.2d at 1335; *Berkowitz*, 662 F.2d at 1134. We find no such prejudice in the instant case.

Appellants' primary argument centers around the cross-examination of the government's chief witness, Martin. While cross-examining Martin, William Butt's attorney elicited testimony to the effect that Carter and Sheehy were present on the night in question and that they were the primary actors in the scheme. We recognize that this testimony was antagonistic to Carter and Sheehy's alibi defense, but it was simply a repetition of what Martin had already told the jury on direct examination. Accordingly, it can hardly be considered to have resulted in compelling prejudice to the alibi defendants. Moreover, even had Carter and Sheehy received a separate trial, they still would have been confronted with Martin's testimony that they masterminded the smuggling operation. In this respect, the fact that Martin's testimony was repeated during cross-examination in the joint trial is of little consequence. *Compare United States v. Leonard*, 494 F.2d 955 (D.C.Cir.1974) (appellant's alibi defense was not materially contradicted solely by co-defendant's mere presence defense where government presented substantial independent evidence countering the alibi).

Accordingly, we hold that the defenses asserted, alibi and mere presence, were not antagonistic to the point of being mutually exclusive or irreconcilable. Because appellants have failed to show that they suffered specific and compelling prejudice as a result of being tried jointly, their convictions will not be disturbed on these grounds.

## IV. SEARCH OF THE SUSPECT AIRCRAFT

Appellant Carter contends that the agents' warrantless search of the suspect aircraft was in violation of the fourth amendment. Specifically, he argues that the search was not the functional equivalent of a border search because the conditions that existed at the border had changed by the time the search occurred. We disagree.

■ It is well-settled that border searches comprise an exception to the man-dates of the Fourth Amendment, and neither a warrant nor any level of suspicion are required to search vehicles or aircraft arriving in the United States. *United States v. Haley*, 743 F.2d 862, 864 (11th Cir.1984); *United States v. Garcia*, 672 F.2d 1349, 1353–54 (11th Cir.1982); *United States v. Stone*, 659 F.2d 569, 572 (5th Cir. Unit B 1981). It is equally clear that a border search need not take place at the actual border, but may be conducted at any place which may be considered the functional equivalent of the border. *See, e.g., Haley*, 743 F.2d at 864–65; *Garcia*, 672 F.2d at 1365–66. A border search may be conducted away from the actual border if: (1) there is a reasonable certainty that the object of the search has just crossed the border, (2) the search takes place at the first practicable point after the border was crossed, and (3) there has been no time or opportunity for the object of the search to have changed materially since the time of the crossing. *Garcia*, 672 F.2d at 1363–64.

■ It is clear beyond question that the first two elements of the above test have been established. Carter contends, however, that the thirty minute interval between the time the plane landed and when it was searched afforded ample time and opportunity for the object of the search to have changed materially. We reject this argument.

In *United States v. Richards*, 638 F.2d 765, 772 (5th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981), the court noted that in regard to border searches, the government must establish that the object searched was in the same condition as when it crossed the border. The Fifth Circuit further noted that this requirement could be met by showing that "the object searched was subject to constant surveillance from the time it crossed the border or that, under the circumstances, the contraband was not likely to have been introduced during any breaks in the surveillance." *Id.* In the instant case, Customs agents maintained constant surveillance of Suspect 13 from before it crossed the border until the time of the

search. After Suspect 13 landed, the agents in the airplanes overhead detected some vehicular activity around the parked plane, but they did not see any loading or unloading. Under these circumstances, it was reasonable for them to assume that whatever was inside the airplane was present before it entered the United States, and it was also reasonable for them to assume that some or all of the suspected contraband would still be aboard the plane when they searched it a short time later. The mere fact that the contraband had been transferred from the airplane to another vehicle before the agents could land and conduct their search does not render the aircraft immune from a valid border search. *See United States v. Lueck,* 678 F.2d 895, 902 (11th Cir.1982).

Accordingly we hold that the search of the suspect aircraft by Customs agents was a valid border search, and that the items seized from within the plane were properly admitted at trial.

## V. COMMENT ON PREARREST SILENCE AND FAILURE TO TESTIFY

Appellant Sheehy contends that testimony was erroneously admitted concerning his prearrest silence and that the prosecutor made an impermissible comment during closing argument regarding his failure to testify. We disagree.

### A. *Prearrest Silence*

The first incident about which appellant complains occurred during the testimony of Customs agent Michael Valva, when the agent described a telephone conversation he had with Sheehy several weeks after the events of July 9, 1981. During that conversation, Sheehy confirmed that he knew the agent had his passport and insulin. Valva told the jury that when he asked Sheehy if he could explain why these items were in the airplane, Sheehy told him that he did not want to answer any more questions without an attorney.

▉ Sheehy argues that this testimony constitutes an impermissible statement about his prearrest silence, and that it had

a prejudicial impact upon the jury, citing *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *United States v. Barton,* 731 F.2d 669 (10th Cir.1984). We find, however, that there is a crucial difference between the instant case, and those relied on by appellant. In *Doyle, Hale* and *Barton,* comments were made about a defendant's *post-arrest* silence after he had been apprised of his rights in accordance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In the instant case, however, we are concerned merely with a witness' brief reference to appellant's *prearrest* silence.

▉ There is no question that in certain circumstances it is permissible for a prosecutor to comment on a defendant's prearrest silence. *See Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *United States v. Riola,* 694 F.2d 670, 673 (11th Cir.), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983). We are not convinced that in the instant case, it is reversible error for a prosecution witness to inadvertently do the same. Sheehy was not in custody at the time the conversation took place; hence we are dealing with prearrest silence. Moreover, we are convinced that the witness' statement was merely intended to show how and why the conversation ended. Viewed in this light, any resulting prejudice would at best be minimal. Accordingly, we hold that Valva's testimony in no way infringed upon Sheehy's constitutional right to remain silent.

### B. *Comment on Failure to Testify*

The second incident about which appellant complains occurred during the government's closing argument. The prosecutor stated:

> You have heard Kevin Sheehy testify—not testify. You heard Agent Valva testify as to what Kevin Sheehy said in a telephone conversation with him and you heard that conversation described ...

(T. at 1955). Appellant Sheehy's argument implies that this was a ploy by the government to improperly comment on his failure to testify. We disagree.

The test for determining whether a prosecutor's remark constitutes an impermissible comment on a defendant's failure to testify is whether "the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Carrodeguas,* 747 F.2d 1390, 1395 (11th Cir.1984) (quoting *United States v. Wilson,* 500 F.2d 715, 721 (5th Cir.1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975)). To prevail on this claim, appellant bears the burden of establishing one of the two criteria set forth in this test. *Carrodeguas,* 747 F.2d at 1395; *United States v. Jones,* 648 F.2d 215, 218 (5th Cir. Unit B 1981).

In applying this test, the court cannot find that counsel "manifestly intended to comment on the defendant's failure to testify if some other explanation for his remark is equally plausible." *Carrodeguas,* 747 F.2d at 1395 (quoting *United States v. Rochan,* 563 F.2d 1246, 1249 (5th Cir.1977)). In the instant case, another explanation is not only equally plausible, but it is even more probable: the prosecutor simply made a misstatement. Clearly the testimony to which she was referring was that of Agent Valva. The prosecutor immediately corrected herself, and accordingly, we find no manifest intent on her part to prejudice appellant.

The second part of the test requires a determination of whether the jury would naturally and necessarily take the statement to be a comment on Sheehy's failure to testify. "[T]he question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so." *Carrodeguas,* 747 F.2d at 1395 (quoting *Williams v. Wainwright,* 673 F.2d 1182, 1185 (11th Cir.1982) (emphasis in original)). Because the prosecutor's remarks were clearly intended as a description of Sheehy and Valva's conversation, the remark was not of such character that a jury would necessarily consider it to be a comment on Sheehy's failure to testify.

We hold that the alleged comment was a misstatement and was not manifestly intended to prejudice appellant, nor was it of such character that a jury would necessarily consider it to be a comment on Sheehy's failure to testify. Accordingly, we find no error on the trial court's part in refusing the motion for a mistrial based on this misstatement.

## VI. EVIDENCE OF PRIOR SIMILAR ACTS

Appellants Buddy Carter, Joy Carter, and Sheehy challenge as error the district court's admission of extrinsic offense evidence pursuant to Fed.R.Evid. 404(b). Specifically, appellants protest the testimony of Jeffrey Martin in which he described receiving 800 pounds of marijuana from the Carters and Sheehy. This transfer allegedly took place two months prior to the events in question in the instant case. According to Martin, Carter and Sheehy told him that they had just flown the marijuana in from Jamaica.

Before allowing this testimony, the district court heard argument on the question of whether this evidence was properly admissible under Rule 404(b), and the court concluded that it was. Following Martin's testimony, the trial judge specifically instructed the jury that the evidence was not to be considered in any way in regard to defendants William Butts, Maryann Best, or Joy Carter. Butts and Best, of course, were not present during this prior similar act, and Martin's testimony was that although Joy Carter was present, she did not actively participate in the unloading and weighing of the marijuana. According to Martin, Joy Carter stood passively by as the men conducted their business in the garage.

Joy Carter claims error in the district court's failure to conduct a preliminary hearing before allowing admission of

this testimony. She contends that had such a hearing been held, the statement regarding her mere presence could have been excluded beforehand. She further argues that such a hearing is required under *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). We do not agree. *Beechum* requires only that the trial judge find sufficient evidence by which a jury could conclude that the defendant committed the extrinsic act. *Id.* at 913. We find that the trial judge did make such a determination and that any alleged prejudice was sufficiently countered by the judge's instructions on this matter.[4]

 Appellants Buddy Carter and Sheehy take the position that this extrinsic act evidence was improperly admitted because it was not relevant to any issue in dispute, and that its probative value was outweighed by its prejudicial effect. We find this argument to be without merit. Clearly the extrinsic act and the acts charged are similar, if not the same, and the extrinsic act tends to make the existence of an unlawful intent more probable than it would be without the evidence. *See Beechum*, 582 F.2d at 911. The extrinsic act is therefore relevant on the issue of intent. We do not find, as appellants urge, that the issue of intent was removed altogether by the fact that they asserted an alibi defense. Regardless of the defense presented, the government still has the burden of proving each and every element of the crimes charged. Intent is an essential element of the charges contained in the indictment, and extrinsic evidence is an ac-

ceptable means of proving that intent. Accordingly, we find no error.

## VII. ADOPTIVE ADMISSIONS AND CO–CONSPIRATOR STATEMENTS

Appellants Sheehy and Butts next contend that the district court erred in admitting into evidence against them certain incriminating statements made by Buddy Carter to Jeffrey Martin, and testified to by Martin in Court. Carter, of course, told Martin about their smuggling activities as Martin drove them from the Corkscrew airstrip to the airport in Ft. Myers. Sheehy and Butts were in the back seat of the car when the conversation took place. The trial court determined that the statements were admissible as adoptive admissions pursuant to Fed.R.Evid. 801(d)(2)(B), and as co-conspirator statements under Fed.R. Evid. 801(d)(2)(E). Appellants argue that the statements should not have come in under either of these two exceptions. We disagree.

### A. *Adoptive Admissions*

 When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement. *United States v. Sears*, 663 F.2d 896, 904 (9th Cir.1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982); *United States v. Moore*, 522 F.2d 1068, 1075–76 (9th Cir.1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637

---

**4.** Following Martin's testimony regarding this prior act, the trial judge instructed the jury, in pertinent part, as follows:

Now, specifically, the Court instructs you that the testimony of this witness as to similar type activity by certain of these defendants is not to be considered by you in any way as to the defendants William Butts, Maryann Butts [sic], or Joy Carter, and you are to disregard that testimony in considering the charges as to the defendants William Butts, Maryann Butts [sic], and Joy Carter, because other acts

committed by other defendants have no relation or bearing on the acts charged against William Butts, Maryann Butts [sic], or Joy Carter.

(10 T.Supp. at 878–88). This admonition was against repeated by the trial court in its instructions at the close of trial. (T. at 2083–84). In light of the fact that Joy Carter was acquitted on all but one of the charges brought against her, we find her argument that she was substantially prejudiced by the prior act testimony to be groundless.

(1976). Before admitting such a statement, the trial court must determine, as a preliminary question, whether these two criteria have been met. *Sears,* 663 F.2d at 904; *Moore,* 522 F.2d at 1076. Appellants argue that this preliminary determination was not made by the trial court in the instant case. We do not agree. Although the trial court did not expressly state the results of its findings on these questions, it nonetheless is clear from the record that the trial judge was very much concerned with the nature of these statements and whether or not appellants were in a position to hear and understand these statements as they were made.[5] The statements implicated appellants in the smuggling scheme. Appellants were seated directly behind Carter and Martin when the conversation took place. Clearly the jury could reasonably have concluded that Sheehy and Butts understood that Carter was specifically implicating them in the illegal activity.[6] We therefore hold that the district court did not err in allowing these statements into evidence.

### B. *Co-Conspirator Statements*

Appellants next contend that the statements should not have been admitted as co-conspirator statements because the prerequisites set forth in *United States v.*

*James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), were not met. Under *James,* declarations by one defendant may be admitted against other defendants as co-conspirator statements under Fed.R. Evid. 801(d)(2)(E), if the trial court is satisfied that substantial independent evidence has been presented that shows that a conspiracy existed between the declarant and the other defendant, and that the statements were made during the course of and in furtherance of the conspiracy. *James,* 590 F.2d at 581. The trial court ruled that there was substantial independent evidence showing the existence of a conspiracy. Appellants argue that this was error because in making this decision, the trial court relied on the statements themselves. The government, on the other hand, argues that such reliance was justified because the statements were admissible adoptive admissions, and could thus be considered as independent evidence.

This court has previously held that a defendant's own statements constitute independent evidence for the purpose of making a *James* determination for that particular defendant. *United States v. Zielie,* 734 F.2d 1447, 1457 (11th Cir.1984),

---

5. The record indicates that the trial judge heard extensive argument on this issue. *See* T. at 1221–28, 1242–55. The district court was primarily concerned with whether these statements were such that the defendants would be inclined to object to them if untrue. The judge also voiced concern over whether the defendants were in a position to hear and understand the statements when made. After considering the evidence relating to these two issues, the trial judge allowed the statements to be considered as adoptive admissions.

In charging the jury on this matter, the trial judge instructed them as follows:

Evidence has been presented that statements suggesting the participation of Defendant Kevin Sheehy and Defendant William Butts in the crimes charged in the indictment were made by Defendant J.R. Buddy Carter to Jeffrey Martin in the car in the early morning hours of July 10th, 1981, and that such statements were not denied or objected to by either Defendant Kevin Sheehy or Defendant William Butts.

If the jury finds that Defendant Kevin Sheehy and William Butts were present and

actually heard and understood those alleged statements and that those alleged statements were made under such circumstances that those defendants would be expected to deny them if they were not true, then you may consider whether their silence was an admission of the truth of the statements.

We agree with the trial court's implicit finding that: (1) the statements related by Martin are such that an innocent defendant would normally be induced to respond; and (2) the government presented ample foundational evidence from which the jury might reasonably conclude that appellants heard, understood, and acquiesced in the statements. Finally, we find that the trial court's charge adequately instructed the jury on the important considerations regarding such statements.

6. It should be noted that there was some evidence that Sheehy and Butts not only heard and understood the statements, but also that they actually participated in a significant portion of the conversation.

cert. denied, —— U.S. ——, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). *United States v. Roe*, 670 F.2d 956, 963 (11th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982). By the same reasoning, we hold that the court may consider as part of the independent evidence the adoptive admissions of the defendant against whom the statements are offered. Consequently, we find that the district court was justified in concluding that there was substantial independent evidence that a conspiracy existed.

■■■ Finally, appellants argue alternatively that at the time Carter made the alleged statements to Martin, the conspiracy had already ended; thus the co-conspirator statements were not admissible under *James* because they were not made during the course of and in furtherance of the conspiracy. *See James*, 590 F.2d at 577. We find appellants argument that the conspiracy ended when the plane landed untenable. The statements were made during the defendants escape from the drug agents. Arriving undetected, or in the alternative escaping, is a primary objective in every drug smuggling operation. We thus hold that the statements made during the defendants' escape constituted statements made during the course of and in furtherance of the conspiracy to import marijuana. *See Sears*, 663 F.2d at 905; *see also United States v. Cannington*, 729 F.2d 702, 709 (11th Cir.1984) (ploy to help drug smugglers escape detection furthered the conspiracy). Accordingly, defendants' convictions will not be disturbed on these grounds.

## VIII. LIMITATION ON CROSS–EXAMINATION

■■■ Appellant Buddy Carter claims that the district court prejudicially restricted his right to cross-examine government witnesses. Limitations on cross-examination are left to the sound discretion of the district court and as long as the restriction does not interfere with the defendant's right of confrontation, such limitations are permissible. *United States v. Alonso*, 740 F.2d 862, 876 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985); *United States v. Burke*, 738 F.2d 1225, 1227 (11th Cir.1984); *United States v. Phelps*, 733 F.2d 1464, 1471–72 (11th Cir.1984). We have reviewed the record and find that appellant had ample opportunity to confront the witnesses on all material aspects of their testimony. Accordingly, appellants' Sixth Amendment confrontation rights were not abridged, and we therefore hold that there was no abuse of discretion.

## IX. LIMITATION ON CLOSING ARGUMENTS

Appellant Joy Carter claims error in the trial court's limitation on the time allotted for closing arguments. At the conclusion of the presentation of evidence, the judge decided that each side would be allowed three hours for closing arguments. The government's rebuttal argument was to be included in its three hours, and the four defense attorneys were told that they could divide their time among themselves as they saw fit.

■■■ The period of time to be allotted for attorneys' closing arguments is within the sound discretion of the district court. *Alonso*, 740 F.2d at 873; *United States v. Roe*, 670 F.2d 956, 971 (11th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982); *United States v. Hirst*, 668 F.2d 1180, 1185 (11th Cir.1982).

■■■ We are convinced that there was no abuse of discretion on the part of the trial court in limiting closing arguments to three hours per side. Joy Carter's argument is based on the fact that her attorney was the last of the defense attorneys to argue, and when his turn arrived, he only had fifteen minutes within which to summarize her case. We note, however, that the trial judge allowed Carter's attorney a few extra minutes within which to conclude. Nonetheless, Joy Carter contends that it was error for the trial court not to extend her time beyond those few extra minutes. We strongly disagree. The defense attorneys were on notice that their

total argument was limited to three hours. It would indeed be a contemptuous assumption on their part to assume that the trial court would extend their time if they, as officers of the court, could not work out an acceptable agreement amongst themselves regarding how much time each would use. Consequently, we find no abuse of discretion on the part of the trial court, either in limiting closing arguments to three hours per side, or in refusing to extend that constraint to accommodate appellants' counsel.

## X. SUFFICIENCY OF THE EVIDENCE

Appellants further contend that the evidence presented against them was legally insufficient to support their respective convictions and that they are therefore entitled to judgments of acquittal. In reviewing this issue, we must determine whether the evidence, when viewed in the light most favorable to the government, is such that a reasonable trier of fact could find that it establishes guilt beyond a reasonable doubt as to each appellant. *United States v. Cole*, 755 F.2d 748, 754 (11th Cir.1985); *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983); *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Moreover, all reasonable inferences must be drawn in favor of the jury's verdict. *Cole*, at 754.

"To sustain the convictions on the conspiracy counts, we must be satisfied that the government proved beyond a reasonable doubt that the appellants had 'deliberate, knowing, specific intent to join the conspiracy.'" *Id.* (quoting *United States v. De Simone*, 660 F.2d 532, 537 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982)). It is well-settled that participation in a conspiracy need not be proved by direct evidence; it may be inferred from the actions of the accused or by circumstantial evidence of a scheme. *Cole*, at 755. It is equally clear that each conspirator "need not be privy to all the details of the conspiracy, or be aware of all the other conspirators, or participate in every stage of the conspiracy." *Id.; United States v. Watson*, 669 F.2d 1374, 1379 (11th Cir.1982).

With these principles in mind, we have reviewed the record and the evidence contained therein as it relates to each of the appellants' convictions. Having reviewed this evidence in the light most favorable to the government, we conclude that a reasonable trier of fact could have found that the appellants were involved in the alleged conspiracy. As for the non-conspiracy charges—importation and possession of marijuana, we find the evidence equally convincing. Accordingly, we hold that the evidence is sufficient to support appellants' convictions.

## XI. SENTENCING

Finally, appellant Buddy Carter contends that the district court improperly relied on *ex parte* material in imposing its sentence on him. We find this argument to be totally without merit. In reference to the memorandum in question, the trial judge stated: "[T]here is nothing in that notice which would in any way bear on the sentencing decision of the Court.... it need not and will not in this instance play any part in my sentencing determination." (T. Vol. 26 at 3–5). Because the trial court did not rely on the undisclosed information, the court was under no duty either to disclose this information or to summarize it. *United States v. Price*, 573 F.2d 356, 365 n. 25 (5th Cir.1978); *United States v. Woody*, 567 F.2d 1353, 1362 (5th Cir.), *cert. denied*, 436 U.S. 908, 98 S.Ct. 2241, 56 L.Ed.2d 406 (1978); *see generally*, Fed.R.Crim.P. 32(a)(3)(A). Consequently, Carter's argument on this issue is rejected.[7]

---

7. Appellant Carter raises several other issues not adopted by his co-defendants; namely: (1) that the government failed to comply with the court's order requiring pretrial notice regarding extrinsic offense evidence; (2) that the government failed to turn over certain material pursuant to the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) prosecutorial misconduct; and (4) judicial bias. We find these arguments to be frivolous. Apart from this observa-

## XII. CONCLUSION

In sum, we hold as follows: (1) the trial court did not commit error in refusing to grant appellants' motions for severance; (2) the Customs agents' search of the suspect aircraft was a valid border search and the items seized were properly admitted at trial; (3) the district court did not err in refusing appellants' motion for a mistrial based on a government witness' comment regarding appellant Sheehy's prearrest silence; (4) prosecutor's slip of the tongue was not an improper comment on appellant Sheehy's failure to testify and the trial judge committed no error in refusing the motion for a mistrial based thereon; (5) trial court did not err in admitting extrinsic offense evidence regarding appellants' prior marijuana dealings; (6) trial court committed no error in admitting co-conspirator statements on the grounds that they constituted adoptive admissions and admissible statements of a co-conspirator; (7) the district court did not abuse its discretion in limiting closing arguments to three hours, or in refusing to extend the time at appellants' request; (8) appellants' right to cross-examine government witnesses was not unduly or prejudicially restricted; (9) the evidence was sufficient to support appellants' convictions, and (10) the court did not improperly rely on *ex parte* material in sentencing appellant Buddy Carter. Accordingly, the appellants' convictions are hereby,

AFFIRMED.

tion, no further discussion of these issues will be undertaken.