**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Patrick L. SWINDALL, Defendant–
Appellant.**

**Nos. 89–8746, 91–8329 and 91–9017.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 31, 1992.

Robert G. Fierer, Atlanta, Ga., for Swindall.

Charles Tiefer, Steven R. Ross, Washington, D.C., for amicus curiae Speaker & Bipartisan Leadership Group of the U.S. House of Representatives.

William P. Gaffney, Asst. U.S. Atty., Drug Task Force, Atlanta, Ga., Mervyn Hamburg, U.S. Dept. of Justice, Crim. Div., Washington, D.C., for U.S.

Before KRAVITCH, Circuit Judge, GODBOLD and JOHNSON *, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

A Northern District of Georgia jury convicted Patrick L. Swindall ("Swindall"), a former member of the U.S. House of Representatives, on nine counts of making false material declarations before a grand jury, in violation of 18 U.S.C. § 1623.[1] In essence, the indictment charged that Swindall had discussed money-laundering transactions with an undercover agent and an intermediary, and then falsely testified to a grand jury to conceal the extent of his involvement in these discussions. Swindall was not charged with any substantive money-laundering offenses. The district court sentenced Swindall to a concurrent twelve-month sentence on each count and imposed a fine of $30,000.

In the first of three consolidated appeals, Swindall argues a number of grounds for reversal of his convictions. Swindall first contends that his Speech or Debate Clause privilege was violated when (a) the government, to establish that Swindall had knowl-edge of statutes that would have informed him of the illegality of the money-laundering transactions, questioned him before the grand jury about his memberships on the Banking and Judiciary Committees of the U.S. House of Representatives; (b) he was indicted on the basis of evidence of these committee memberships; (c) he was convicted on the basis of the same information; and (d) he was convicted on the basis of committee reports introduced by the government at trial. Second, Swindall contends that an *ex parte* conference between the prosecutor and the district judge violated Swindall's Fifth and Sixth Amendment rights. Third, Swindall argues that the district court improperly struck the testimony of defense witness Congressman Barney Frank ("Representative Frank"). Fourth, Swindall claims that his right against self-incrimination was violated when the prosecution improperly commented to the jury regarding Swindall's decision not to testify at trial. Finally, Swindall claims that the elements of perjury were not present because his declarations to the grand jury were (1) literally true, (2) in response to fundamentally ambiguous questions, and (3) not material to the grand jury's investigation.[2]

We reverse Swindall's convictions on Counts One, Nine, and Ten because of violations of his Speech or Debate privilege, and instruct the district court on remand to vacate the convictions and to dismiss these counts with prejudice. We affirm Swindall's convictions on the remaining six counts.

In both the second and third appeals consolidated here, Swindall argues that he

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

1. 18 U.S.C. § 1623 provides, in part: "Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. Appellant also raises the following claims, which we reject without discussion: the district court committed reversible error by erroneously admitting co-conspirator hearsay statements under Fed.R.Evid. 801(D)(2)(e) in the absence of a finding that the government established the existence of a conspiracy; Swindall's right to due process was violated when he was compelled to use a peremptory strike to disqualify a biased juror; his right to a fair trial was denied because the trial court was biased in favor of the prosecution; his right to a fair trial was denied because the prosecution engaged in misconduct; and the denial of a bill of particulars violated Fed.R.Crim.P. 7(f).

is entitled to either dismissal of the indictment or a new trial because of newly discovered evidence and governmental misconduct. The district court denied Swindall's motions for dismissal or new trial, and we affirm.

## BACKGROUND

### A. Background Relevant to the First Appeal

In 1987, the Internal Revenue Service's Criminal Investigation Division was conducting an investigation, called Operation Boots, of money-laundering activities throughout the nation. In one facet of the investigation, undercover agent Mike Mullaney ("Agent Mullaney") was posing as Mike Martinez, a representative of Colombian drug dealers. Agent Mullaney began to launder money through Charles LeChasney ("LeChasney") and others.

Swindall, who knew LeChasney from various Republican Party fundraising events, believed him to be a wealthy financial consultant, not the least because LeChasney lived in an historic mansion in an affluent section of Atlanta and appeared to own a fleet of antique and luxury cars. In fact, he was a bankrupt con artist whose fraudulent schemes had left a trail of victims. LeChasney, who was himself under investigation and who was later arrested and convicted, was not cooperating with the government and was unaware that the person he knew as Mike Martinez was in fact undercover agent Mike Mullaney.

In mid–1987, Swindall asked LeChasney for financial advice concerning a million-dollar note he held, which matured in four years and was earning eight-percent interest. The note represented part of the proceeds of the sale of commercial real estate in downtown Atlanta. Swindall, who was in need of funds to pay for cost overruns on a home he was having built, wanted to sell the note or use it to obtain a loan, whichever generated the most favorable tax consequences. LeChasney informed Swindall that he knew of investors who might be willing to buy the note, but who would pay only in cash. He explained that the cash was "flight capital" smuggled from Central American countries by refugees fleeing oppression, and that the investors needed to hide their assets and conceal their identities to protect themselves from the governments of these countries.

According to the government, Swindall was aware of two particular money-laundering statutes because of his membership on the House Banking and Judiciary Committees. One statute prohibited laundering funds that are the proceeds of unlawful activities such as selling drugs.[3] The other statute, enacted in response to money launderers who engaged in transactions of less than $10,000 to avoid triggering reporting requirements, prohibited structuring a transaction to cause a financial institution not to file a report that would otherwise be required.[4] Both bills were part of the Anti–Drug Abuse Act of 1986 and each was considered by either the Banking or

---

3. 18 U.S.C. § 1956 ("Laundering of monetary instruments") provides in part that it is a violation of the law for someone:

> (a)(1) knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— ...
> (B) knowing that the transaction is designed in whole or in part—
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
> (ii) to avoid a transaction reporting requirement under State or Federal law. ...

4. 31 U.S.C. § 5324 ("Structuring transactions to evade reporting requirements prohibited") provides:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) [reporting-requirement statute] with respect to such transaction—
> (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);
> (2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) that contains a material omission or misstatement of fact; or
> (3) structure or assist in structuring or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Judiciary Committee during Swindall's tenure in Congress.

In July 1987, LeChasney reported to Agent Mullaney that Swindall wanted to sell a million-dollar note and, according to LeChasney, was interested in selling it offshore to evade taxes. Agent Mullaney reported this information to superiors, who opened a tax-evasion and currency-reporting investigation of Swindall.

### 1. *The Marriott Meeting*

On August 28, 1987, Swindall, LeChasney, and Agent Mullaney met at the Marriott Hotel in Atlanta. The government secretly videotaped the meeting. Swindall told Agent Mullaney that, because of changes in the tax laws, he was no longer interested in selling the note, but he was interested in obtaining a loan. Agent Mullaney—mentioning nothing about Colombian drug dealers—told Swindall that he represented South American investors who wished to dispose of cash, hide their assets, and conceal their identities. He informed Swindall that any deal would be in cash.

Swindall stated that he was interested in a mortgage loan and suggested a scheme whereby LeChasney would form a mortgage company, secretly funded by the agent's investors, that would lend Swindall money. Swindall would sign the million-dollar note over to LeChasney's newly formed corporation, which the agent's investors would eventually purchase. The advantages of this scheme included that (1) Swindall could have use of the money without realizing an immediately taxable gain from sale of the note; (2) the investors could anonymously dispose of their cash; and (3) Swindall could point to LeChasney's corporation as the source of the loan and deny that he had ever made a deal with Agent Mullaney.

Although the deal would be made to appear to be a mortgage loan from LeChasney to Swindall, Swindall and the undercover agent negotiated the price of the actual deal—a sale of the note for cash. They discussed a price in the range of $850,000, which was $80,000 higher than the present value of the note.

Swindall asked why he could not simply deposit the cash in a bank in one lump sum. Agent Mullaney explained that currency transaction report forms ("CTRs" or "bank forms") would require, *inter alia*, that Swindall reveal the source of the funds, which would be unacceptable to the agent's investors. It was therefore imperative that the bank forms either not be filed or be filed falsely. LeChasney—who was to receive a large commission from the deal—informed Swindall that it would take him at least three weeks to convert such a large amount of cash into cashier's checks without triggering the currency-reporting requirements. No agreement was reached because, among other reasons, Swindall refused to accept delivery of the cash personally, and neither Swindall nor the undercover agent was willing to assume the risk of loss during the three weeks required to convert the cash into cashier's checks.

### 2. *Further Discussions*

The government then closed its investigation of Swindall as he had not indicated an intention to evade his taxes. On September 3, however, the government reopened the investigation, this time with regard to money-laundering and transaction-structuring violations, because LeChasney had advised Agent Mullaney that Swindall was now willing to accept the cash personally. LeChasney informed the agent that Swindall was in immediate need of $100,000 because of the cost overruns on his home. Swindall's increasingly pressing need for funds eventually resulted in the inclusion of an advance payment of $150,000 in the proposed deal.

During the course of negotiations, Agent Mullaney spoke several times on the telephone with LeChasney and occasionally with Swindall. The agent recorded these conversations. On September 7, Swindall related to the agent his fear that the cash came from drug sales. The agent responded that he had been told the cash was flight capital, but that he could not guarantee the source. He told Swindall that "the specter of drugs is there," but that he personally was not involved in selling

drugs. The agent also told Swindall that "some of the manipulations ... with the cash may well be illegal in and of themselves," especially in light of the reporting requirements for transactions in excess of $10,000. Swindall stated that it was his position that he would be borrowing money from LeChasney and he had no knowledge or interest in how LeChasney obtained his funds. In other words, Swindall was protected because he could deposit checks from LeChasney's corporation and, when depositing them, truthfully state their direct source. As part of the actual deal, however, Swindall agreed to accept delivery of the cash and to tender a secret document acknowledging his assignment of the note to Agent Mullaney. The parties agreed that Swindall would sign this document in the agent's presence.

Agent Mullaney testified that up until that point, his ability to inform Swindall that the cash came from illegal sources was hampered by LeChasney's attempts to mislead Swindall about the legality of the deal. While the agent's objective was to investigate whether Swindall was willing to participate in money-laundering transactions, LeChasney was eager, if not desperate, to receive the sizeable commission that would come from the completed deal. The agent testified that he wanted to inform Swindall of the source of the funds at their next face-to-face meeting, with LeChasney present, so that LeChasney could not continue falsely to assure Swindall that the cash was flight capital. Throughout the later negotiations, as Swindall stated that he could not directly participate in a deal involving the proceeds of drug sales, LeChasney continued to assure him that the money was clean, while the undercover agent continued to state, with *widely* varying degrees of certainty, that drugs were probably involved.

### 3. The Greenbriar Meeting

On September 13, Swindall and LeChasney met Agent Mullaney at the Greenbriar Resort in White Sulphur Springs, West Virginia, the site of a Congressional golf tournament. Their conversation was secretly recorded by the agent. Discussing the process by which LeChasney would convert the cash into cashier's checks, the agent asked LeChasney whether he intended to "stay under the ten thousand dollars," which would circumvent the requirement that CTRs be filed. Swindall added, "I assume you are, aren't you, Charles?"

Swindall asked the agent if the source of the cash was drug money. The agent told Swindall that it was his "gut feeling" that "there are narcotics dollars in there." He told Swindall that the money was not flight capital and that in the past he had laundered cash from such illegal activities as skimming profits from casinos. Swindall assured the agent that "anything you tell me is told in total confidence from this point forward." During a discussion of the risk the Congressman was taking, Swindall stated that "there's no question in this transaction that I am basically using Charles as my buffer," and "where Charles gets his money is his business, his problem." Swindall stated that he was still undecided about the deal and that he wanted to "sleep on it."

### 4. Further Negotiations and Swindall's Eventual Rejection of the Deal

On September 18, Agent Mullaney advised LeChasney that he would deliver $150,000 in advance, and the balance directly to Swindall at the time the note was transferred. The agent insisted that he receive a handwritten note from Swindall acknowledging that Swindall had received the $150,000 from the agent himself and not from LeChasney's buffer corporation.

Because Agent Mullaney's superiors ordered him to delay delivery of the advance payment, LeChasney, still eager to receive his commission, agreed to advance Swindall the $150,000. In fact, LeChasney did not have $150,000. He was able, however, to present Swindall with a check in that amount drawn from the escrow account of his attorney, Douglas Daum ("Daum"). LeChasney, with the aid of an accomplice at Dean Witter, falsely represented to Daum that he had enough money in a Dean Witter account to cover the check. Le-

Chasney meanwhile had incorporated the buffer corporation, called the Gulf Coast Mortgage Company. The government introduced evidence that the $150,000 check was part of the larger deal. The defense contended that this was a truly separate loan agreement between LeChasney and Swindall and that LeChasney would be reimbursed by Agent Mullaney only if Swindall and the agent came to an agreement.

On Friday, September 25, Swindall received the check at Daum's office. Swindall signed a document evidencing his receipt of the check, but the document acknowledged only LeChasney's corporation, not the undercover agent. Swindall assigned in writing $150,000 of his million-dollar note to LeChasney's corporation "as an advance upon a real estate loan upon my residence ... the total amount of the loan to be ... $850,000." Swindall then delivered the check to the builder of his home.

Swindall and Agent Mullaney had agreed to meet that weekend for delivery of the cash. On Saturday evening, however, Swindall called the agent to inform him that he was not going forward with the transaction because of the potential liability. They spoke again later in the evening in an unsuccessful attempt to save the deal. Swindall told the agent, "The only reason I can't [sign the note acknowledging the cash from the agent] is I would be essentially laundering y'all's money, which I can't do. In other words, if Charles wants to launder y'all's money, fine. But I can't do that."

Although Swindall argues that the $150,000 check "had nothing to do" with the larger transaction, once the deal with Agent Mullaney fell through, (1) Swindall called the builder and told him not to deposit the check; (2) Swindall returned the check to Daum; (3) LeChasney returned Swindall's note; and (4) Daum and LeChasney stopped payment on their respective checks. The IRS closed the investigation against Swindall. LeChasney, however, attempted unsuccessfully during the next few weeks to resuscitate the deal.

### 5. Swindall's Grand Jury Appearance and Resulting Indictment

In January 1988, the government indicted and arrested LeChasney for money-laundering. On January 28, after learning of LeChasney's arrest, Swindall contacted the U.S. Attorney's Office in Atlanta and asked to speak with someone regarding his financial dealings with LeChasney. Two IRS agents visited Swindall at his home that night and took a statement. On February 2, 1988, Swindall appeared before a federal grand jury investigating money-laundering activities. The government informed Swindall that he was a subject, not a target, of the investigation. According to the government, Swindall perjured himself before the grand jury to conceal the extent of his involvement in discussions about illegal money-laundering transactions.

The grand jury returned a ten-count perjury indictment against Swindall on October 17, 1988. In brief, the indictment charged that Swindall made the following false statements that were material to the grand-jury investigation: he stated that during negotiations with the undercover agent, he had never satisfied himself as to the "criminality" of the proposed transactions, and that he did not recall being told that LeChasney's conversion of the money would violate federal currency reporting requirements (Count One); he stated that he did not recall discussions about being insulated by LeChasney from the source of the undercover agent's money (Count Two); he stated that he walked away from the deal on September 13, 1987, after the Greenbriar meeting, when in fact he continued negotiating until the end of September (Count Three); he stated that he did not recall being told by the undercover agent that the source of the cash was drug-sale proceeds (Count Five); he stated that "every time I talked with Mike [Agent Mullaney], I was insisting that the money be delivered without my being present" (Count Six); he stated that the $150,000 check he received from LeChasney "had nothing to do with" the larger, $850,000 transaction with the undercover agent (Count Seven); he stated that he had given the $150,000 check to his secretary and

instructed her not to deposit it, when in fact he had delivered the check to the builder of his home (Count Eight); he stated that he did not recall conversations about avoiding filing bank forms (Count Nine); and finally, he stated that he did not recall being informed by the undercover agent that the agent's investors were engaging in the transaction to "wash" or "launder" cash (Count Ten).

A first trial—scheduled at Swindall's request for October 1988 to give him a chance to retain his seat in the House by winning acquittal before Election Day— was aborted stemming from charges that Swindall had mailed to potential jurors campaign literature claiming that he had passed a lie detector test concerning the perjury charges. Swindall lost his campaign for reelection and went to trial in May 1989. During the trial, the district court dismissed Count Four of the indictment. A jury found Swindall guilty on all the remaining counts. Swindall filed a timely notice of appeal.

### B. Background Relevant to the Second and Third Appeals

#### 1. Second Appeal

While his direct appeal was pending, Swindall filed motions in the district court. asking for either dismissal of the indictment on the ground of governmental misconduct or a new trial on the basis of newly discovered evidence. The district court, after holding an evidentiary hearing, denied Swindall's motion. Swindall filed a timely notice of appeal.

#### 2. Third Appeal

In July 1991, Swindall filed another motion seeking a new trial or dismissal of the indictment, claiming additional newly discovered evidence and again alleging governmental misconduct. The district court denied Swindall's motion, and Swindall filed a timely notice of appeal. This court ordered the three appeals consolidated.

## DISCUSSION

### I. Speech or Debate Clause and Related Claims

#### A. Procedural Background

Before trial, Swindall moved to have the indictment dismissed because, *inter alia,* he was questioned by the Assistant U.S. Attorney ("AUSA") before the grand jury in violation of the Speech or Debate Clause.[5] In the grand jury proceeding, the AUSA sought to establish, by questioning Swindall, that because of his memberships on the House Banking and Judiciary Committees, Swindall had knowledge of the money-laundering and transaction-structuring statutes.[6] The government later used the inference that Swindall knew the contents of the statutes to show that the Congressman (1) lied when he told the grand jury that he was not convinced of the criminality of the proposed transactions and (2) had a motive to lie when he stated that he could not recall whether conduct violating the statutes had been discussed.

Examples of the AUSA's questioning of Swindall included the following:

> Mr. Swindall, particularly being a member of the Banking Committee, I'm sure you're aware of the recent amendments to Title 31 which have to do with the structuring violations ... which deal with the specific issue of people structuring financial transactions underneath ten thousand dollars so they can—they [can] avoid those sorts of things.

> \* \* \* \* \* \*

> Q. Now, in your capacity on the Banking Committee, which has to do with banking regulations and the filing of forms, you are aware that one of the reasons why we have that law is to find out about all this cash that floats in—
>
> A. That's correct.
>
> Q.—from people that are engaged in narcotics trafficking?

---

**5.** "[F]or any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 2.

**6.** Unless otherwise indicated, we will refer to the two statutes together as "the money-laundering statutes."

A. That is correct.

Q. Now, I assume that you had that knowledge when you met with them in August, at least that general knowledge?

A. I did.

Q. Now, with that knowledge in mind, you're telling us that what you were going to say was that you were going to take the money and say that the source of the money was something other than what it was?

\* \* \* \* \* \*

Mr. Swindall, and I don't mean to sound facetious, but you're telling us that as a member of the Banking Committee and as a member of Congress who, I would assume, and I don't even know how you voted on this issue, but I would assume you voted for the passage of this act, and you were on the—specifically on the Banking Committee, and you're telling the grand jury now that you didn't even know it was in existence until Friday?

None of the ten counts of the indictment referred directly to Swindall's committee memberships, however. The magistrate judge recommended that the motion to dismiss the indictment be denied but that the government be prohibited from introducing evidence at trial mentioning the defendant's committee memberships. In its Objections to the Magistrate's Report and Recommendation ("Government's Objections to Magistrate's Report"), the government stated that it sought to "introduce evidence that the Defendant was a member of the Judiciary and the Banking Committees and that money laundering statutes, specifically, the 1986 amendments, were matters addressed by those committees." The government urged that:

[i]t is critical to the prosecution of the case by the United States that this evidence be provided to the jury. The undercover operation of this investigation involved the Defendant's conversations about circumvention of bank forms and violation of federal currency laws. Un-

7. H.R.Rep. No. 855, 99th Cong., 2d Sess. (1986).

8. H.R.Rep. No. 746, 99th Cong., 2d Sess. (1986). The government argues that Swindall waived

like any other citizen in the United States, the Defendant would have a *unique and specific knowledge* in the understanding of the illegality of the circumvention of the currency transaction reports because of his former status as a member of the House Judiciary and Banking Committee.

(Emphasis added.)

The district court affirmed the magistrate judge's recommendation to deny the motion to dismiss the indictment but overruled the magistrate judge on the evidentiary issue, holding that evidence of Swindall's membership on the House Banking and Judiciary Committees could be admitted at trial, with certain restrictions on both the prosecution and the defense's use of other legislative evidence. The district court permitted the government to argue the inference that Swindall had knowledge of the bills' contents because of his committee memberships.

Swindall did not immediately appeal from the portion of the pretrial order denying his motion to dismiss the indictment, although such an appeal was available. *See Helstoski v. Meanor*, 442 U.S. 500, 506, 99 S.Ct. 2445, 2448, 61 L.Ed.2d 30 (1979). Swindall did, however, make a standing objection, on Speech or Debate grounds, to all reference by the prosecution to his committee memberships and other legislative activities.

At trial, the government referred to Swindall's committee memberships in both its opening and closing statements and introduced the Report of the House Judiciary Committee on the Money Laundering Control Act of 1986[7] and the Report of the Committee on Banking, Finance, and Urban Affairs to the Comprehensive Money Laundering Prevention Act.[8] The government also introduced pages from the Congressional Record indicating that Swindall served on the Judiciary Committee from 1985 to 1988 and the Banking Committee from 1987 to 1988. According to the Government's Response to Defendant's

his objection to the introduction of the committee reports.

Motion for a New Trial Based on Newly Discovered Evidence:

> The purpose of the introduction of the Defendant's committee memberships was to establish that he was a member of the Judiciary Committee during the passage of the Money Laundering Control Act of 1986, which ... generally prohibited the laundering of funds which were the proceeds of unlawful activity such as drug dealing. The purpose of the introduction of the Defendant's membership on the House Banking Committee ... was to show that the Committee had jurisdiction over relevant laws which ... address the illegality of structuring cash deposits or cash transactions in order to circumvent the filing of a currency transaction report.

To rebut the inference that he knew the details of the 1986 money-laundering statutes because of his committee memberships, Swindall called Representative Frank to testify. The district court's pretrial order prohibiting Swindall from introducing evidence of legislative acts stated that he could introduce instead "evidence of the number of bills before these committees and then argue that it is not reasonable to infer that a congressman is intimately aware of every bill before his committee."

Representative Frank's testimony contained a discussion of the legislative history of the Money Laundering Control Act of 1986. He stated that although the Judiciary Committee worked on the measure, the anti-structuring provisions were not in the Judiciary Committee's version of the act. At the time, Swindall was not yet on the Banking Committee. Frank explained that members of the House of Representatives tend to specialize and often trust the judgment of colleagues about the contents of noncontroversial bills. He stated that a typical Representative might know the contents of less than ten percent of the bills considered by the House.

The prosecutor then asked for a recess, and engaged in an unannounced but recorded *ex parte* conference with the judge in chambers. At the conference, the prosecutor warned that if the court allowed Frank to continue to testify in this vein, the government would be forced to introduce "devastating" evidence that, far from delegating consideration of the money-laundering bills to others, Swindall actually "signed on as a co-author of the very bill that we are investigating in this case."[9]

When court reconvened, the judge stated that he had held an *ex parte* conference with the prosecutor concerning evidence that the government might proffer and that, to protect Swindall's Speech or Debate privilege, he was ordering the entirety of Frank's testimony stricken. Later, the judge clarified his ruling, stating that he was striking Frank's testimony because it had gone farther than allowed by the pretrial order, and that his decision was unrelated to the information he received in the *ex parte* conference.

Finally, the prosecutor told the jury in his closing statement:

> So when he went in the grand jury he knew the importance of the forms. He knew how important that was to the grand jury's investigation because he said he had specifically read that. He knew the importance of those forms. But yet, even with that in his mind, and he had to think about it all weekend, he still goes in there and says, "Well, Greenbriar, no, we didn't discuss the forms." Why did he have such a faulty memory about that? Because he knew that was the focus or one of the focuses of the grand jury's investigation. The forms....
>
> And he also, I'm reminded by Mr. Swindall, was on the banking and the judiciary committee, the very committees that had jurisdiction over these two laws. There are about 240 million Americans. 435 of them are in Congress. And the documents will go out with you. Do you

---

9. Swindall argues that the prosecutor misled the district court during the conference because the bill in question neither became law nor contained a structuring provision, and was co-sponsored, not co-authored, by Swindall. The government counters that although the bill did not become law, it was the predecessor to the bill that eventually was passed.

know how many of them on the Republican side are on both the Judiciary and the Banking Committees at that time in the One–Hundredth Congress? Two; two.

And yet he would have you believe he was not aware of the law. Who then will we hold accountable to the law? Who then stands before the law, if not a man that's a lawyer, a congressman on those committees, and only two Republican congressm[e]n on both of those committees. But yet he did not know.

### B. Counts Affected by the Speech or Debate Claims

In our view, Swindall's Speech or Debate claims affect only Counts One, Nine, and Ten. Only with respect to these counts did the government use evidence of Swindall's committee memberships to show that he had "unique and specific knowledge"[10] of the illegality of (1) structuring transactions to avoid reporting requirements in violation of 31 U.S.C. § 5324, or (2) knowingly engaging in financial transactions that conceal the source of the proceeds of illegal activity in violation of 18 U.S.C. § 1956. The government used evidence of this knowledge to prove that Swindall lied when he told the grand jury that he was not convinced of the criminality of the proposed transactions and to show that Swindall had a motive to lie when he stated that he could not recall whether conduct that violated these two statutes had been discussed.

Count One charged that Swindall committed perjury "to conceal from the grand jury *the nature and scope of his knowledge* that the alleged conduct of Mike Martinez (Agent Mullaney) and the proposed laundering of the $850,000 in cash by Charles LeChasney, *was illegal conduct.*" (Emphasis added.) According to the government's argument at trial, because Swindall was aware of the contents of the two money-laundering statutes, he lied when he stated that "I never satisfied myself of anything with respect to criminality."

Count Nine charged that Swindall, *"understanding* that the bank forms (CTR) are important tools in tracking and tracing the flow of cash into financial institutions," testified falsely that he did not recall discussing with LeChasney and Agent Mullaney why bank forms should not be filed. (Emphasis added.) According to the government's argument at trial, Swindall's knowledge that 31 U.S.C. § 5324 prohibited structuring transactions to avoid bank-form reporting requirements gave him the motive to lie about his recollection.

Count Ten charged that Swindall testified falsely that he did not recall being told why Agent Mullaney's investors were dealing in cash. According to the government's argument at trial, Swindall's knowledge that 18 U.S.C. § 1956 prohibited participating in laundering the proceeds of unlawful activity gave him the motive to lie about his recollection.

■ The remaining counts are unaffected by Swindall's Speech or Debate claims because the government did not attempt to prove Swindall's "unique and specific knowledge" of the specific contents of 31 U.S.C. § 5324 or 18 U.S.C. § 1956 to give him a motive to lie. Count Five, for instance, alleged that Swindall falsely stated that he did not recall being informed by Agent Mullaney that the agent had in the past violated the laws of the United States. This count did not allege that Swindall lied about whether he knew of the illegality of such activity. Nor did it depend on Swindall's knowledge of the contents of the two money-laundering statutes to give him a motive to lie. The agent's statement itself provided Swindall with the knowledge of illegality to have a motive to lie about his memory of the conversation.

Count One is the only count in which Swindall stated that he did not know that the transactions were illegal. Count Nine and Ten are the only counts in which Swindall's knowledge of the specific contents of the two money-laundering statutes gave him a motive to lie in response to such otherwise seemingly innocuous questions

---

**10.** *See* Government's Objections to Magistrate's Report, *supra.*

as "Did you discuss the need to file bank forms?" and "Did you discuss why the investors were dealing in cash?" Only someone with knowledge of the money-laundering statutes would know why truthful answers to these questions would expose him to liability. In none of the remaining counts—concerning such matters as whether Swindall walked away from the deal, how close he came to an agreement, or whether he discussed using LeChasney to shield him from liability—was it relevant that he had knowledge that, specifically, transaction-structuring and laundering the proceeds of unlawful activity violated the law.

### C. Speech or Debate Clause Analysis

Swindall argues that the district court erred in (1) refusing to dismiss the indictment and (2) admitting into evidence Swindall's committee memberships and reports issued by those committees. He contends that the remedy for these violations is dismissal of the indictment or, in the alternative, a new trial. In other claims connected to the Speech or Debate issue, Swindall contends that the district court committed reversible error by limiting on Speech or Debate grounds the evidence the defense could present; holding an unannounced *ex parte* conference with the prosecutor; and striking the testimony of Representative Frank.[11]

The government urges that because inquiry was merely made into Swindall's legislative status, not his legislative acts, the Speech or Debate privilege was not violated. Alternatively, the government contends that if the privilege was violated, dismissal is not the proper remedy because the indictment was facially valid. Review of Swindall's Speech or Debate claims is *de novo*.

We hold that (1) the AUSA's questioning of Swindall before the grand jury about his committee memberships violated the Speech or Debate clause; (2) it was error to allow reference to be made to Swindall's committee memberships both in the grand jury proceeding and at trial;[12] and (3) the remedy for the violations of the privilege is dismissal of the affected counts.[13]

There are two reasons why the Speech or Debate Clause prohibits inquiry into a member of Congress's committee assignments even if the member's specific legislative acts are not mentioned. First, our review of Supreme Court precedent convinces us that the privilege protects legislative status as well as legislative acts. Second, here the government's inquiry into Swindall's committee memberships actually amounted to an inquiry into legislative acts. The government was allowed to argue a permissive inference that Swindall knew the details of the money-laundering statutes because of his status as a member of the Banking and Judiciary Committees. If the inference is drawn that Swindall acquired knowledge of the statutes *through* his committee memberships, one sees that Swindall could have acquired such knowledge *only* by performing a legislative act such as reading a committee report or talking to a member of his staff.

Article I, section 6 of the U.S. Constitution provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." Explaining the rationale for the privilege, the Supreme Court has stated that "[s]ince the Glorious Revolution in Britain, and throughout United States history, the [legislative] privilege has been recognized as an important protection of the independence and integrity of the legislature. In the American governmental

**11.** For the reasons stated below, we do not reach these three claims.

**12.** Because we reverse the convictions on the affected counts based on the inquiry into Swindall's committee memberships, we need not decide the procedural question of whether Swindall properly objected to the introduction of the committee reports. We note, however, that it is

well established that committee reports are protected by the Speech or Debate privilege. *See, e.g., Hutchinson v. Proxmire,* 443 U.S. 111, 124–25, 99 S.Ct. 2675, 2683, 61 L.Ed.2d 411 (1979).

**13.** Our discussion will focus on the indictment, but we will also refer to the trial when useful to clarify a point.

structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *United States v. Johnson,* 383 U.S. 169, 178, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966). "[T]he central role of the Speech or Debate Clause [is] to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Gravel v. United States,* 408 U.S. 606, 617, 92 S.Ct. 2614, 2623, 33 L.Ed.2d 583 (1972) (citing *Johnson,* 383 U.S. at 181, 86 S.Ct. at 755).

 The Speech or Debate Clause "at the very least protects [a member of Congress] from criminal or civil liability and from questioning elsewhere than in [Congress]." *Gravel,* 408 U.S. at 615, 92 S.Ct. at 2622. The clause gives members of Congress two distinct privileges: (1) freedom from questioning, which is in the nature of a testimonial privilege, *and* (2) freedom from liability, which means that reference may not be made in court to a defendant's legislative activities.[14] Protection from criminal liability includes protection from prosecution, not merely from conviction. *See United States v. Helstoski (Helstoski I),* 442 U.S. 477, 488, 99 S.Ct. 2432, 2439, 61 L.Ed.2d 12 (1979).

 The clause is read broadly to effectuate its purposes. *See Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 501, 95 S.Ct. 1813, 1820, 44 L.Ed.2d 324 (1975). Legislative activities covered by the privilege include issuing committee reports and holding hearings, *see Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), as well as *"those things generally said or done in the House or the Senate in the performance of official duties." United States v. Brewster,* 408 U.S. 501, 512, 92 S.Ct. 2531, 2537, 33 L.Ed.2d 507 (1972) (emphasis added).

### D. The Speech or Debate Clause and Legislative Status

In other cases in which courts have interpreted the scope of the Speech or Debate Clause, the issue generally has been whether the activity the legislator wishes to shield from scrutiny is truly a legislative activity or is instead "casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Id.* at 528, 92 S.Ct. at 2545.

> Insofar as the Clause is construed to reach other matters [than pure speech or debate], they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Gravel,* 408 U.S. at 626, 92 S.Ct. at 2627. In *Brewster,* for example, the Supreme Court held that inquiry into the defendant's agreement to take a bribe in exchange for his vote was not prohibited by the Speech or Debate Clause because bribe taking obviously is not related to legislative activities. *Brewster,* 408 U.S. at 528, 92 S.Ct. at 2545. In *Gravel,* the Court held that members' lobbying of executive branch officials—even though generally done—was not protected because such activity was "beyond the legislative sphere." *Gravel,* 408 U.S. at 625–26, 92 S.Ct. at 2627. *See Johnson,* 383 U.S. at 172, 86 S.Ct. at 751.

Here, there is no contention that the subject of the inquiry—Swindall's memberships on the House Banking and Judiciary Committees—is "beyond the legislative sphere." The question instead is whether evidence of a legislator's status as a member of a particular committee is, like evidence of his or her legislative acts, protected by the privilege.

The government argues that inquiry confined to whether a legislator was a member of a committee does not violate the privilege because it does not call into question a specific legislative act, speech, or vote. A

---

**14.** The freedom from liability is derived from the freedom from questioning: "Revealing information as to a legislative act—speaking or debating—to a jury would subject a Member to being 'questioned' in a place other than the House or Senate." *United States v. Helstoski (Helstoski I),* 442 U.S. 477, 490, 99 S.Ct. 2432, 2440, 61 L.Ed.2d 12 (1979).

close examination of what the privilege is supposed to protect, however, demonstrates why a legislator's committee membership may not be the subject of inquiry.

In *Gravel*, the Supreme Court stated that "the Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch. It thus protects Members against prosecutions that *directly impinge upon or threaten the legislative process.*" *Gravel*, 408 U.S. at 616, 92 S.Ct. at 2622 (emphasis added). The Court also noted that "the courts have extended the privilege to *matters* beyond pure speech or debate in either House, but 'only when necessary to prevent *indirect impairment of such deliberations.*'" *Id.* at 625, 92 S.Ct. at 2627 (quoting *United States v. Doe*, 455 F.2d 753, 760 (1st Cir.1972)) (emphasis added).

Nowhere does the *Gravel* Court draw a distinction between "activity" and "status," nor does such a distinction appear to have significance. The Court's reference to "matters" beyond pure speech and debate seems to indicate that, within "the legislative sphere," the Court was not concerned about differentiating between the constituent elements of the legislative process. Rather than calling for a distinction between "status" and "activity," Supreme Court precedent directs us to ask: does inquiry into a legislator's committee memberships directly impinge on or threaten the legislative process? 408 U.S. at 625, 92 S.Ct. at 2627. Does it make legislators accountable before a possibly hostile judiciary? *See id.* at 617, 92 S.Ct. at 2623. And does it indirectly impair legislative deliberations? *Id.* at 625, 92 S.Ct. at 2627.

The answer to each of these questions is yes.

The government argued at trial that introducing evidence of Swindall's committee memberships was "critical" to its perjury case. It seems obvious that levying criminal or civil liability on members of Congress for their knowledge of the contents of the bills considered by their committees threatens or impairs the legislative process. For example, as the House of Representatives operates today, according to the stricken testimony of Representative Frank, members specialize, devoting their time to only a limited amount of legislation.[15] Particularly with respect to noncontroversial issues, members depend on the expertise, competence, and good faith of colleagues when passing on bills with which they have little familiarity. This system, according to the judgment of the members, allows the House to work in the most efficient manner.

If legislators thought that their personal knowledge of such bills could one day be used against them, they would have an incentive (1) to avoid direct knowledge of a bill and perhaps even memorialize their lack of knowledge by avoiding committee meetings or votes, or (2) to cease specializing and attempt to become familiar with as many bills as possible, at the expense of expertise in any one area. Either way, the intimidation caused by the possibility of liability would impede the legislative process. Prohibiting inquiry into committee membership thus advances the Speech or Debate Clause's "fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *Id.* at 618, 92 S.Ct. at 2623.[16]

---

**15.** Our reference to Representative Frank's stricken testimony should not be taken as a comment on the propriety of the district court's ruling. We treat the representative's explanation of the workings of the House as we would a learned treatise: as an aid to our discussion coming from an authoritative source. We do not treat it as evidence.

**16.** The threat of intimidation does not extend only to members of Congress who expect to become criminal defendants one day. A member could face the prospect of civil liability if a committee assignment could be used against him or her in court to prove knowledge of legislation. For instance, a member of Congress might sell a restaurant, representing that the property is in complete compliance with all applicable laws and regulations. If later it turns out that the property is not in compliance with the Americans with Disabilities Act (ADA), the purchaser, who is forced to make significant expenditures to make the property accessible to wheelchairs, could sue the member for fraud, claiming intentional misrepresentation and in-

**E. Swindall's Legislative Activities, Not Merely His Status, Were the Subject of the Government's Inquiry**

Moreover, it is inaccurate to call an inquiry into committee membership an inquiry into status rather than legislative activities. The government concedes that it could not introduce evidence of Swindall's speeches, votes, or legislative decisions to prove his knowledge of the money-laundering statutes. The district court ruled in its pretrial order that the government could not "question defendant about whether he attended committee hearings on these bills, whether he participated in debate on the bills, *or whether he or his aides ever read the bills.*" [17] (Emphasis added.)

The district court, however, "permit[ted] the government to argue that the jury may infer that defendant knew of the contents and requirements of these bills because he sat on the committees that considered them." This permissive inference [18] allowed the jury to infer that Swindall performed legislative *acts* to acquire knowledge about the bills. As *Amicus Curiae* Speaker and Bipartisan Leadership Group of the U.S. House of Representatives argues, "Knowledge of a committee member does not come from a vacuum; it comes from the committee's consideration of bills, reports, hearings, and debates." The government introduced evidence of Swindall's committee memberships to prove that he performed a legislative act to acquire knowledge of the contents of the bills, which is precisely what the clause prohibits. *See Helstoski I,* 442 U.S. at 494, 99 S.Ct. at 2442 (Stevens, J., dissenting) ("I agree that [*Brewster* and *Johnson* ] ... prevent the prosecution from *attempting*

*to prove that a legislative act was performed.*") (emphasis added).

The district court prohibited the government from offering proof that Swindall "ever read the bills," but it allowed the jury to *assume* that Swindall read the bills. That the inference refers to a legislative act that possibly never took place does not mitigate the Speech or Debate violation. In fact, it makes it worse: to rebut the inference, Swindall would be forced to answer for his entire approach to the legislative process to explain why he did not know of the contents of the bills. Allowing the inference, which virtually compels Swindall to justify his legislative actions, frustrates the purpose of the Speech or Debate privilege. As the Supreme Court stated in *Powell v. McCormack,* 395 U.S. 486, 505, 89 S.Ct. 1944, 1955, 23 L.Ed.2d 491 (1969), "the ... protection [is] afforded legislators ... to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions."

**F. The Proper Remedy for the Violations of the Privilege**

■ Having determined that the Speech or Debate Clause covers a legislator's committee memberships, we also hold that the violations of the privilege that occurred before the grand jury require dismissal of the affected counts.[19]

**1. *Protection from Indictment***

When a violation of the privilege occurs in the grand jury phase, a member's rights under the privilege must be vindicated in

---

troducing evidence that the legislator was on a committee that considered the ADA.

**17.** As noted above, the privilege extends to "those things generally said or done in the House or Senate in the performance of official duties." *Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537.

**18.** [T]he entirely permissive inference or presumption ... allows—but does not require— the trier of fact to infer the elemental fact [the fact that is an element of the crime] from

proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. In that situation the basic fact may constitute prima facie evidence of the elemental fact.
*County Court of Ulster County v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979) (citations omitted).

**19.** We also note that the violations of the privilege at trial, if they stood alone, would require a new trial on the affected counts.

the grand jury phase.[20] " '[T]he instigation of criminal charges' is the 'predominant thrust' of the clause. In scrutinizing a criminal prosecution drawing into question legislative acts or the motivation for performing them, 'we look particularly to the prophylactic purposes of the clause.' " *United States v. Helstoski (Helstoski II),* 635 F.2d 200, 204 (3d Cir.1980) (quoting *Johnson,* 383 U.S. at 182, 86 S.Ct. at 756). It is not merely fear of conviction that can intimidate a legislator and threaten the legislative process; fear of indictment also can threaten the process. It was an indictment, not a conviction, that hung over Swindall's head when he lost his reelection bid in 1988.

We must recognize that the mere issuance of an indictment has a profound impact on the accused, whether he be in public life or not. Particularly for a member of Congress, however, publicity will be widespread and devastating. Should an election intervene before a trial at which he is found innocent, the damage will have been done, and in all likelihood the seat lost. Even if the matter is resolved before an election, the stigma lingers and may well spell the end to a political career.

Far from being hyperbolic, this evaluation of an indictment's effect is coldly realistic. It cannot be doubted, therefore, that the mere threat of an indictment is enough to intimidate the average congressman and jeopardize his independence. Yet, it was to prevent just such overreaching that the speech or debate clause came into being. A hostile executive department may effectively neutralize a troublesome legislator, despite the absence of admissible evidence to convict, simply by ignoring or threatening to ignore the privilege in a presentation to a grand jury. Invocation of the constitutional protection at a later stage cannot undo the damage. If it is to serve its purpose, the shield must be raised at the beginning.

Observance of this rule will not foreclose indictments for illegal conduct beyond the scope of the speech or debate clause. All that is required is that in presenting material to the grand jury the prosecutor uphold the Constitution and refrain from introducing evidence of past legislative acts or the motivation for performing them. In that way the clause will meet its expectation of preserving the constitutional structure of separate, coequal, and independent branches of government.

*Helstoski II,* 635 F.2d at 205–06 (citations omitted).

### 2. *The Nature of the Speech or Debate Violations*

■ During the grand jury phase, Swindall's Speech or Debate privilege was violated in two separate ways. First, his privilege against criminal liability was violated when reference to Speech or Debate material was used as critical evidence leading to his indictment. Second, his privilege against being questioned in any place other than Congress was violated when he was questioned before the grand jury about Speech or Debate matters. Each violation, standing alone, requires dismissal of the affected counts.

■ The government argues that because the indictment was facially valid, it should not be dismissed. Generally, a court will not look behind the face of an indictment to invalidate it merely because the grand jury received incompetent evidence. *See United States v. Calandra,* 414 U.S. 338, 344, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974); *see also United States v. Carney,* 665 F.2d 1064, 1065 (D.C.Cir. 1981) (applying general rule to Speech or Debate claim), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981). A court will consider the evidence received by the grand jury, however, when what transpired before the grand jury itself violates a constitutional privilege. *See Calandra,* 414 U.S. at 346, 94 S.Ct. at 619; *Helstoski II,* 635 F.2d at 203.

---

**20.** Not every improper reference to Speech or Debate material before the grand jury is a violation of the privilege, however. See *infra* II. F.2.a.

a. *Criminal Liability.*—A member's Speech or Debate privilege is violated if the Speech or Debate material exposes the member to liability, but a member is not necessarily exposed to liability just because the grand jury considers improper Speech or Debate material. "A member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts." *Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537. If reference to a legislative act is irrelevant to the decision to indict, the improper reference has not subjected the member to criminal liability.[21] The case can proceed to trial with the improper references expunged.

The government points out that in other cases involving improper inquiry into the legislative activities of criminal defendants, the Supreme Court has provided only the remedy of a new trial, not dismissal of the indictment. In *Johnson,* Speech or Debate material was improperly presented to the grand jury, and the Court ordered a new trial, reasoning that "the Government should not be precluded from a new trial on [a] count ... wholly purged of elements offensive to the Speech or Debate Clause." *Johnson,* 383 U.S. at 185, 86 S.Ct. at 758. The Court determined that the government's conspiracy case could be proved without evidence of a speech the member made on the floor of the House. We can extrapolate from this that evidence of the speech was not essential to the indictment

and thus did not subject the member to liability at the grand jury stage. Similarly, in *Brewster,* the Supreme Court held that an indictment referring to legislative acts could stand because "[t]o make a prima facie case under this indictment, the Government need not show any act of [Brewster] subsequent to the corrupt promise for payment," and a conviction could be sustained without "inquir[y] into the [legislative] act or its motivation." *Brewster,* 408 U.S. at 526–27, 92 S.Ct. at 2544–45.[22]

In *Helstoski II,* however, the Third Circuit dismissed an indictment because improper Speech or Debate material was presented to the grand jury. According to the court:

Neither *Brewster* nor *Johnson* went behind the face of the indictment, and apparently, it was not contended in either case that the mere introduction of speech or debate material before the grand jury invalidated the indictment. *It can be argued that implicit in the Court's holdings that the cases could be tried without reference to protected matters was the conclusion that the grand juries' considerations of the privileged material were not fatal to the indictments.* Particularly in the circumstances of this case, however, *where the infection cannot be excised,* we are unwilling to adopt an interpretation limiting a right the Court has told us is so vital that it must be treated with sensitivity.

*Helstoski II,* 635 F.2d at 205 (emphasis added and citations omitted).[23] The court

---

**21.** For example, suppose a grand jury indicted a legislator for bank robbery after a prosecutor presented it with evidence of (1) a gun with the member's fingerprints, (2) a photograph of her robbing the bank, and (3) a copy of a speech she made on the floor of the House in favor of saving the Northern Spotted Owl. There would be no violation because the Speech or Debate material would not have exposed the legislator to liability.

We note that this is not a harmless error argument. The Speech or Debate privilege is not merely an evidentiary or a testimonial privilege. *See Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537. As the Supreme Court has stated, "The Speech or Debate Clause was designed neither to assure fair trials nor to avoid coercion. Rather, its purpose was to preserve the constitutional structure of separate, coequal, and inde-

pendent branches of government." *Helstoski I,* 442 U.S. at 491, 99 S.Ct. at 2441. Therefore, a harmless-error analysis will not excuse a violation. In the absence of liability, the grand jury's consideration of improper evidence is not a Speech or Debate violation at all.

**22.** Likewise, in *United States v. Myers,* 635 F.2d 932, 941 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980), an indictment was allowed to stand because it charged an illegal promise to perform a legislative act, and there was no reason to assume that at trial the government would have to introduce evidence of the actual performance of the act.

**23.** The court added: "We do not know whether transcripts of the grand jury proceedings were available in *Johnson* and *Brewster.* Only in

determined that because the improper use of Speech or Debate material was so widespread, it was inseparable from the indictment. In other words, it exposed the member to criminal liability.

In the case at bar, the improper Speech or Debate evidence likewise was fatal to the indictment. This is not because the improper references were so widespread. Rather, it is because evidence of Swindall's legislative acts was an essential element of proof with respect to the affected counts. In the words of the government in its objections to magistrate's report and recommendation:

> [i]t is *critical to the prosecution of this case* by the United States that this evidence be provided to the jury. The undercover operation of this investigation involved the Defendant's conversation about circumvention of bank forms and violation of federal currency laws. *Unlike any other citizen in the United States*, the Defendant would have a *unique and specific knowledge* in the understanding of the illegality of the circumvention of the currency transaction reports *because of* his former status as a *member of the House Judiciary and Banking Committees.*

(Emphasis added.) The government itself argued that it could not have proved Swindall's knowledge of criminality without showing the grand jury that he was on the committees that considered the money-laundering statutes.

■ One must also bear in mind that this was a perjury indictment. The impressions formed by the grand jury that Swindall was lying were based in part on the AUSA's questioning of the Congressman about Speech or Debate matters. The grand jury observed Swindall respond to questions about his committee member-

ships, and then judged the truthfulness of his statements disclaiming knowledge or recollection of other matters. With respect to the affected counts, no new indictment can issue from an excised transcript of Swindall's grand jury testimony because the decision to indict was inextricably linked to the grand jury's impressions of Swindall's answers to improper questions. As in *Helstoski II*, "the infection cannot be excised." 635 F.2d at 205.

■ b. *Improper Questioning.*— Moreover, even if the Speech or Debate material considered by the grand jury were separable from the decision to indict, the second distinct violation of Swindall's privilege requires dismissal of the affected counts. Alone among the defendants in the cases discussed, Swindall was also subjected to improper questioning before the grand jury.[24] We already have stated that when improper evidence is considered by a grand jury, a Speech or Debate violation occurs only if the evidence causes the jury to indict. When a member is improperly questioned, however, the violation occurs automatically. "[I]t is the very act of questioning that triggers the protection of the Speech or Debate Clause." *In re Grand Jury (Intervenor "A")*, 587 F.2d 589, 598 (3d Cir.1978).

■ The only way to vindicate a member's privilege to be free from improper questioning is to exclude the fruits of such questioning. If the questioning occurs at trial, a conviction cannot stand. If the questioning occurs before the grand jury, the affected counts of the indictment cannot stand. Otherwise, there would be no deterrent to prosecutors from improperly haling a member of Congress before a grand jury to ask questions about protected legislative activities as long as they had sufficient other evidence to indict.[25] The

recent years has verbatim recording of grand jury proceedings become common." *Id.*

24. In *Johnson*, the member was improperly questioned at trial.

25. Arguably, a member could refuse to answer the questions on Speech or Debate grounds. The instant case, however, demonstrates why a

member might not freely invoke the privilege when testifying before a grand jury. Obviously, Swindall would never have been indicted for perjury if he had invoked his Fifth Amendment right against self-incrimination. Political reality, however, precluded him from doing this. A leak from the grand jury that Swindall had taken the Fifth most likely would· have badly damaged his political career. Likewise, using

AUSA's impermissible questioning of Swindall before the grand jury eliminates any doubts about the appropriateness of dismissal that might have lingered had the AUSA merely introduced evidence of Swindall's committee memberships.[26]

### G. The Ex Parte Conference and the District Court's Evidentiary Rulings Related to the Speech or Debate Issue

Because we dismiss Counts One, Nine, and Ten on Speech or Debate grounds we need not consider the propriety of the district court's evidentiary rulings limiting Swindall's defense on the committee-membership issue to "evidence of the number of bills before these committees and then argu[ing] that it is not reasonable to infer that a congressman is intimately aware of every bill before his committee." For the same reason, we need not reach the propriety of either striking the entire testimony of Representative Frank or holding an unannounced *ex parte* conference with the prosecutor. The *ex parte* conference did not affect the fairness of the rest of the trial and thus cannot be grounds for reversal of the remaining counts. *See United States v. Walsh,* 700 F.2d 846, 858 (2d Cir.1983), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983).[27]

### II. *Improper Reference to Swindall's Failure to Testify*

Swindall next argues that his Fifth Amendment right against self-incrimination was violated when the prosecutor improperly referred to his failure to testify, and that the district court committed reversible error when it gave a curative instruction instead of ordering a mistrial. The government contends, and we agree, that the prosecutor's question, rather than being a comment on Swindall's failure to testify, was instead directed to defending the credibility of a government witness.

### A. Procedural Background

Kirk Smith ("Smith") was a defendant in a related money-laundering trial who was convicted of conspiracy. He had testified that Swindall, while attempting to trade trial dates in order to go to trial before the November 1988 election, had boasted that he would not be convicted of perjury because, "Kirk, I'm a lawyer, and in front of the grand jury I used phrases like 'to the best of my recollection' and 'I don't recall,' and they can't convict me for having a bad memory."

A mini-trial on the truthfulness of Smith's testimony ensued. The govern-

the Speech or Debate Clause to avoid answering questions about one's potentially criminal conduct could be politically damaging, and a legislator might be intimidated from invoking the privilege.

It is permissible for the government to put Swindall to a Hobson's choice concerning his Fifth Amendment right, which is his alone. It would violate the Constitution, however, to put Swindall to such a choice concerning his Speech or Debate privilege, which he in a sense holds in trust for the benefit of the people. We quote again the *Helstoski I* Court: "The Speech or Debate Clause was designed neither to assure fair trials nor to avoid coercion. Rather, its purpose was to preserve the constitutional structure of separate, coequal, and independent branches of government." *Helstoski I,* 442 U.S. at 491, 99 S.Ct. at 2441. The very act of putting a member to a choice between his freedom and his political career causes the intimidation detrimental to the legislative process that the clause prohibits.

**26.** That a legislative act is memorialized in a public record does not, of course, sidestep the

Speech or Debate issue. A member's legislative acts are protected whether or not they are published. *See, e.g., Gravel,* 408 U.S. at 615, 92 S.Ct. at 2622 (noting that member is protected from questioning "with respect to the events occurring at the subcommittee hearing at which the Pentagon Papers were introduced into *the public record*") (emphasis added). If the member himself or herself republishes a speech or a committee report, such republication is not a legislative act and is not protected. *See Hutchinson v. Proxmire,* 443 U.S. 111, 127–28, 99 S.Ct. 2675, 2684, 61 L.Ed.2d 411 (1979). Here, however, if Swindall had himself published in a circular that he was a member of the Banking and Judiciary Committees, he would retain his Speech and Debate privilege. He would lose the privilege only if he published a circular stating that because of his committee memberships he had knowledge of the money-laundering statutes.

**27.** We note, however, that *ex parte* conferences "should occur but rarely, especially in criminal cases." *United States v. Adams,* 785 F.2d 917, 920 (11th Cir.1986).

ment called Dr. Edwin Hall ("Dr. Hall"), Smith's psychologist, who corroborated Smith's testimony, stating that Smith had repeated the comment to him contemporaneously. In its case in chief, the defense called Robert G. Fierer ("Fierer"), who had been Smith's lawyer at the time of the meeting with Swindall.[28] Smith had testified that after the meeting, Fierer had told him that they could possibly use Swindall's statement in the future by going to the government with it. Fierer testified that he never heard Swindall make such a statement, nor had he commented to Smith about it.

The defense also called Bobby Lee Cook ("Cook"), a criminal defense lawyer, to attack the credibility of Dr. Hall. The defense theory was that either (1) Smith lied about Swindall's testimony hoping for a sentence reduction or (2) Smith's ability to tell the truth was impaired by Dr. Hall's manipulations.

On cross-examination, the prosecutor asked Cook:

> Would it also be a fair statement or assumption to make that, particularly in a criminal case, *if a defendant were to testify* and he knew that certain things that he testified about could help him win his case that *he would be more prone to testify in that regard*?

(Emphasis added.) Defense counsel immediately objected and, out of the presence of the jury, asked for a mistrial on the ground that the prosecutor had impermissibly commented on Swindall's failure to testify.[29] Both defense counsel and the court apparently misheard the prosecutor's question because the district court agreed with defense counsel's assertion that the prosecutor had asked whether a defendant would *choose* to testify if he thought it would help

his case.[29] As quoted above, the prosecutor actually asked about a defendant who already had decided to testify.[30]

The prosecutor stated that his question was part of an effort to defend Smith's credibility. According to the prosecutor, he first planned to ask Cook, as an experienced criminal defense attorney, about defendants' motivations when testifying about certain matters. Second, he planned to recall Fierer to the stand in the government's rebuttal case and adduce testimony that, preparing for Smith's trial, Fierer had told Smith that his best chance of winning was by testifying that he had withdrawn from the conspiracy, but that Smith had not given such testimony, later explaining to Fierer that he could not give untrue testimony.

### B. Analysis

"The test for determining whether a prosecutor's remark constitutes an impermissible comment on a defendant's failure to testify is whether 'the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Carter*, 760 F.2d 1568, 1578 (11th Cir.1985) (quoting *United States v. Carrodeguas*, 747 F.2d 1390, 1395 (11th Cir.1984) (quoting *United States v. Wilson*, 500 F.2d 715, 721 (5th Cir.1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975)), *cert. denied*, 474 U.S. 816, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985)). The burden is on appellant to establish either one of these two criteria. *Carter*, 760 F.2d at 1578.

#### 1. Manifest Intent of Statement

"In applying this test, the court cannot find that counsel 'manifestly intended' to

---

**28.** Fierer is now representing Swindall in these appeals.

**29.** Defense Counsel: Your Honor, that is a direct comment upon Mr. Swindall's right not to take the stand in his own defense if he doesn't want to.

He's asked this witness in the presence of the jury won't a defendant *take the stand and testify* if he thinks it would help him.

The Court: Yes, that was the question.

(Emphasis added.)

**30.** Prosecutor: My question, your honor, did not involve whether or not they testified but if they do testify whether or not they're more prone to ... give answers under oath that they think will help them either financially or get them off the hook, but not whether or not they're willing to get up and testify or not testify. It has to do with when they're testifying.

comment on the defendant's failure to testify if some other explanation for his remark is equally plausible." *Id.* at 1578 (quoting *Carrodeguas*, 747 F.2d at 1395) (quoting *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir.1977)). We review the district court's determination of whether "manifest intent" was present under an abuse of discretion standard. *United States v. Watson*, 866 F.2d 381, 386 (11th Cir.1989).

We agree with the district court that the prosecutor's explanation for his remark is, at the very least, as plausible as an interpretation that the prosecutor intended to comment on the defendant's failure to testify. Swindall argues that the explanation is not plausible because (1) Fed.R.Evid. 608 prohibits specific instances of a witness's conduct probative of character for truthfulness from being proved by extrinsic evidence, such as direct examination of another witness; (2) an attorney with the prosecutor's experience would therefore not lay the groundwork for evidence that could not be admitted; and (3) the only remaining explanation is that the prosecutor commented on Swindall's failure to testify.

We note first that appellant's Rule 608(b) argument fails because in fact the prosecutor *did* call Fierer to the stand on rebuttal and *did* question Fierer about the specific instance of Smith's conduct, and defense counsel *did not object* on Rule 608(b), or any other, grounds. We also note that Rule 608(b) provides that evidence of specific instances of a witness's conduct may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of [a] witness ... concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." Fierer already had testified for the defense that Smith had falsely testified about the meeting with Swindall. Arguably, the prosecutor could be allowed to recall Fierer on rebuttal and ask him, as if he were still

cross-examining him, about specific instances of Smith's character for truthfulness. At the very least, the closeness of the question renders the prosecutor's explanation as plausible as any other.

### 2. *How a Jury Would Understand the Statement*

"The second part of the test requires a determination of whether the jury would naturally and necessarily take the statement to be a comment on [the defendant's] failure to testify. [T]he question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so." *Carter*, 760 F.2d at 1578 (quoting *Carrodeguas*, 747 F.2d at 1395) (quoting *Williams v. Wainwright*, 673 F.2d 1182, 1185 (11th Cir.1982)). If the jury correctly heard the prosecutor's question, it would not have construed the question to be an impermissible comment about a defendant's decision to take the stand. Further, the trial court's curative instruction was adequate. *See United States v. Capo*, 693 F.2d 1330, 1335 (11th Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983).

### III. *Falsity and Materiality of Swindall's Statements and Ambiguity of the AUSA's Questions*

Swindall next argues that, with respect to each count of the indictment, the government failed to prove the essential elements of perjury: that Swindall knowingly made false statements that were material to the grand jury investigation. Swindall also argues that, as a matter of law, some of his statements could not be false because the questions were fundamentally ambiguous.[31]

### A. Falsity

We review a jury's determination of the falsity of statements made to a grand jury to determine "whether a reasonable jury

---

**31.** We do not reach Swindall's claims regarding Counts One, Nine, and Ten because of our holdings dismissing these counts on Speech or Debate grounds. We reject as meritless Swindall's falsity, materiality, and ambiguity claims regarding other counts not explicitly discussed below.

could so conclude beyond a reasonable doubt," viewing the evidence in the light most favorable to the government. *United States v. Abrams,* 568 F.2d 411, 417 n. 25 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).[32]

▆▆▆ Swindall argues that the statement for which he was convicted in Count Seven—that the $150,000 check he received from LeChasney on September 25, 1987, had "nothing to do with" the proposed $850,000 deal with Agent Mullaney was literally true because "there was a clear distinction between the $150,000 LeChasney check and the Mullaney cash." Swindall admitted, however, that he signed a document stating that "I ... have this day received the sum of One Hundred and Fifty Thousand Dollars ($150,000.00) as an *advance* upon a real estate loan upon my residence ... *the total amount of the loan to be Eight Hundred and Fifty Thousand Dollars* ($850,000.00)." (Emphasis added.) Swindall attempted to explain that, despite his signing of this document, the $150,000 check from LeChasney was an entirely separate loan agreement. Evidence further connecting the check to the larger deal, however, included that (1) Swindall discussed the check with Agent Mullaney as one of a series of $150,000 payments, and (2) after the larger deal fell through, Swindall returned the check and LeChasney stopped payment on the check. We hold that there was sufficient evidence for a reasonable jury to find that Swindall's statement was false.

### B. Fundamental Ambiguity

▆▆▆ Swindall contends that, as a matter of law, he cannot be convicted for making the false statements charged in Count Two because the AUSA's questions were fundamentally ambiguous.[33] We note first that "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Bronston v.*

*United States,* 409 U.S. 352, 360, 93 S.Ct. 595, 601, 34 L.Ed.2d 568 (1973).

"When a line of questioning is so vague as to be 'fundamentally ambiguous,' the answers associated with the questions posed may be insufficient as a matter of law to support [a] perjury conviction." *United States v. Manapat,* 928 F.2d 1097, 1099 (11th Cir.1991) (quoting *United States v. Lighte,* 782 F.2d 367, 375 (2d Cir.1986)). Review is *de novo. See Manapat,* 928 F.2d at 1099.

When, however, a question is only *arguably* ambiguous and " 'an answer would be true on one construction of [the] question but false on another' ... the defendant's understanding of the question is a matter for the jury to decide." *United States v. Bell,* 623 F.2d 1132, 1136 (5th Cir.1980)[34] (quoting *United States v. Slawik,* 548 F.2d 75, 86 (3d Cir.1977)). In such a situation, we review under the same sufficiency-of-the-evidence standard used for a jury's determination of falsity. *See Bell,* 623 F.2d at 1136. Further, "the fact that some ambiguous questions were asked does not preclude a perjury conviction. 'If the response given was false as the defendant understood the question, his conviction is not invalidated by the fact that his answer to the question might generate a number of different interpretations.' " *Lighte,* 782 F.2d at 375 (2d Cir.1986) (quoting *United States v. Williams,* 552 F.2d 226, 229 (8th Cir.1977)).

▆▆▆ Swindall stresses particularly that the question contained in the following colloquy was ambiguous:

Q: Do you have a specific recollection about engaging in a conversation wherein it was discussed a money trail or the ramifications of the money trail from Mike's [Agent Mullaney's] sources to ultimately you and what potential liability would exist or you would be exposed to?

**32.** Decisions of the former Fifth Circuit issued before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**33.** The government erroneously asserts in its brief that Swindall failed to challenge on appeal the falsity of the statements contained in this count.

**34.** See *supra* note 32.

A: *No.* Only in the sense that I said, would you do the deal, would you do it, if you were in my shoes? That's my recollection.

(Allegedly false declaration underlined.)

"A question or phrase is ambiguous as a matter of law when it 'is not a phrase with a meaning about which men of ordinary intelligence could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony.'" *Manapat*, 928 F.2d at 1100 (quoting *United States v. Lattimore*, 127 F.Supp. 405, 410 (D.D.C.), *aff'd*, 232 F.2d 334 (D.C.Cir.1955)). To demonstrate the degree of ambiguity here, defense counsel on cross-examination asked Agent Mullaney the exact same question set out above. The agent stated that he was "not sure" whether he understood it.

Although this question standing alone indeed appears to be ambiguous, we are unconvinced that it was so ambiguous as to have removed from the jury the issue of the falsity of Swindall's answer. First, parsing this question into its essential elements, we see that the AUSA asked whether Swindall engaged in a conversation in which it was discussed what his "potential liability" would be if a "money trail" connected him with the undercover agent's investors. That Swindall correctly understood this to be a question about whether he discussed the liability to which he was exposing himself by taking the cash was evidenced by his answer: "No. Only in the sense that I said, would you do the deal, would you do it, if you were in my shoes?"

Second, a review of the question in the context of the line of questioning that preceded it indicates that it was, in fact, rather precise. The AUSA first asked a series of questions about whether Swindall had first discussed the illegality of the deal and then discussed using LeChasney as a buffer to shield him from liability. The AUSA asked Swindall five times [35] if Swindall had discussed using LeChasney as a buffer, and each time Swindall evaded answering the question. Finally, the AUSA divided the question into two parts: first, did Swindall discuss his potential liability, and second, did he discuss using LeChasney as a buffer. In this context, it is our view that a person of ordinary intelligence would understand the question.

Swindall answered that he did not recall any specific discussion about protecting himself from liability. The government played for the jury, however, a tape in which Swindall stated that "there's no question in this transaction that I am basically using Charles as my buffer," and "where Charles gets his money is his business, his problem." We find that the question was at most "arguably ambiguous" and that there was ample evidence for the jury to determine either that Swindall understood the question, or that his answer was false with respect to any reasonable construction of the question.

## C. Materiality

Swindall argues that the government failed to prove that the false statements charged in Count Three were material. "A statement is material if it is capable of influencing the grand jury's investigation. To the extent that truthful answers

---

**35.** Were you advised about the illegality of the operation, and yet you continued to discuss the fact that Charles would be used as a buffer for you?

\* \* \* \* \* \*

Did you state that Charles would be used as a buffer for you in this negotiation?

\* \* \* \* \* \*

And I'd like you to give me an answer yes or no, or whatever you think your answer should be as to whether or not following the statement that your conduct might be illegal whether you continued to discuss the fact that Charles would be your buffer in the transac-

tion, therefore, blocking you from any sort of exposure?

\* \* \* \* \* \*

Following that conversation that you've told us about, did you continue to negotiate the deal and continue to put forward the proposition that LeChasney would be used as your buffer in this transaction?

\* \* \* \* \* \*

And what I'm saying is, following that conversation, did you continue to negotiate how the deal would be transpired by using Charles LeChasney as your buffer in this transaction?

might assist the grand jury's investigation, false statements are material notwithstanding an abundance of evidence facilitating access to the truth." *United States v. Corbin,* 734 F.2d 643, 654 (11th Cir.1984) (citations omitted). Further, "the statement need not be material to any *particular* issue but may be material to any proper matter of inquiry." *Abrams,* 568 F.2d at 420. Materiality is a legal question subject to *de novo* review. *United States v. Molinares,* 700 F.2d 647, 653 (11th Cir. 1983).

Count Three charged Swindall with falsely stating that he "walked away from [the deal], basically," after the Greenbriar meeting. Swindall argues that this statement is not material because he admitted later in his testimony that "after Greenbriar I was back in it." We agree with the district court that this statement is material because, if believed, it would have steered the grand jury away from inquiry into later money-laundering discussions. Swindall's subsequent testimony that the negotiations continued did not diminish the materiality of the earlier false statement and did not qualify as a recantation. *See* 18 U.S.C. § 1623(d); *United States v. Scrimgeour,* 636 F.2d 1019, 1024 (5th Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 359, 70 L.Ed.2d 188 (1981).[36]

## IV. *Newly Discovered Evidence and Governmental Misconduct I*

■ Case No. 91–8329 is an appeal from the district court's denial of Swindall's first post-trial motion for either a new trial on the basis of newly discovered evidence or dismissal of the indictment on the ground of governmental misconduct. After a thorough review of the record, we agree with the district court that Swindall's claim of prosecutorial misconduct is without merit. We reject this claim without discussion and turn to the district court's denial of Swindall's motion for a new trial based on newly discovered evidence. We review under an abuse-of-discretion standard. *See United States v. Russo,* 717 F.2d 545, 550 (11th Cir.1983).[37]

Swindall contends that the government withheld the contents of three surveillance tapes[38] in which Swindall was mentioned by LeChasney, Agent Mullaney, and Amado Hernandez ("Hernandez"), a confidential informant who assisted Agent Mullaney in the money-laundering investigation.[39]

Whether a defendant is entitled to a new trial based on newly discovered evidence that was suppressed by the government is controlled by *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963): "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "Impeachment evidence ... falls within the *Brady* rule," *id.* at 676, 105 S.Ct. at 3380, when the "reliability of a given witness may well be determinative of guilt or innocence." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

---

**36.** See *supra* note 32.

**37.** Because of our Speech or Debate Clause holdings, we do not reach Swindall's claims with respect to Counts One, Nine, and Ten. We reject all other claims that we do not specifically discuss.

**38.** The district court found that hundreds of tapes were made during the multi-city money-laundering investigation.

**39.** By failing to brief or argue them on appeal, Swindall waives his claims that the government also improperly withheld a statement by a witness regarding the $150,000 check from LeChasney's Dean Witter account and information about the contents of bank and brokerage accounts controlled by LeChasney.

To state a claim under *Brady*, a defendant must show:

> (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir.), *cert. denied*, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989) (citations omitted). Because we agree with the district court that Swindall has not satisfied the fourth prong, we will limit our discussion to why Swindall cannot show a reasonable probability that the outcome of the proceeding would have been different if the newly discovered evidence had been disclosed to the defense.

Swindall's allegations include that the tapes reveal (1) a plot between LeChasney, Agent Mullaney, and Hernandez to "set up" Swindall to put him in a compromised position, and (2) that Agent Mullaney gave false testimony about the connection between LeChasney's $150,000 check and the larger deal.

It must be remembered that Swindall was convicted of perjury, not money-laundering. Tapes relating to an alleged entrapment plot would not be relevant to whether Swindall knowingly made false statements to the grand jury. As the government notes, there is no "perjury trap" defense available to Swindall here. *See United States v. Chen*, 933 F.2d 793, 797 (9th Cir.1991). This evidence is therefore relevant only to impeaching the credibility of witnesses LeChasney and Agent Mullaney.

Unfortunately for Swindall, the star witness against him was himself. In Counts Two, Three, Five, Six, and Eight, Swindall was convicted for falsely testifying about conversations in which he had participated or about actions that he had personally taken. With respect to most of these counts, Swindall's grand jury statements were contradicted by Swindall's earlier tape recorded statements. Attacking the credibility of other witnesses could not undermine confidence in these convictions.

Impeaching the credibility of LeChasney and Agent Mullaney is relevant only to Count Seven, in which the government charged that Swindall falsely stated that the $150,000 check from LeChasney "had nothing to do with" the proposed $850,000 deal with the agent. In fact, even in Count Eight, Swindall's own tape recorded statements tied the $150,000 check so closely to the larger deal that it is difficult to imagine how impeaching LeChasney and Agent Mullaney could undermine confidence in the conviction.

In a tape recorded September 25 conversation, *after* Swindall received the $150,000 from LeChasney but before he returned it, Swindall and Agent Mullaney engaged in the following colloquy:

> Swindall: All right. Let me see if I understand this before we get together. Here is my objective: I have signed an assignment and given Charles the original note.
>
> Agent: Right.
>
> Swindall: *Each time* Charles gives me his check for a hundred and fifty, I will sign *another* note—
>
> Agent: Right.
>
> Swindall: —*that updates it to the eight-fifty.* There will never be—As far as I'm concerned, I will always be taking Charles' money.

(Emphasis added.) Further, as noted above, (1) Swindall signed a document acknowledging that the check was an advance on the larger loan, and (2) Swindall's actions in returning LeChasney's check after rejecting the deal with Agent Mullaney strongly indicate that Swindall testified falsely about one having "nothing to do with" the other.

Further, we note that LeChasney was so thoroughly discredited during the original trial that the prosecutor in his closing statement was forced to tell the jury:

> I want to talk about Charles LeChasney, and I want to give Mr. LeChasney a

grade. Let's give Mr. LeChasney a score. I would like to suggest a score for Mr. LeChasney, if you don't mind me giving you a suggestion: Zero. Zero. Give Charles LeChasney a zero, except where Charles LeChasney's testimony is corroborated either by statements made by Patrick Swindall or by his brother or by other witness[es]. Give him a zero.

It is hard to imagine how further diminution of LeChasney's credibility is possible, let alone likely to have affected the outcome of the trial.

We note also that the statements of Agent Mullaney recorded on the tapes were made in the agent's undercover role as a representative of Colombian drug dealers. The district court found that Agent Mullaney made the statements in keeping with his assigned pose. We agree with the district court that such statements do not diminish the credibility—or even contradict—the statements that Agent Mullaney made under oath in the trial. We therefore need not delve deeply into appellant's assertions about how the statements on the tapes should be interpreted.[40]

Accordingly, we affirm the district court's denial of Swindall's first post-trial motion.

## V. *Newly Discovered Evidence and Governmental Misconduct II*

Case No. 91–9017 is an appeal from the district court's denial of Swindall's second post-trial motion for either a new trial on the basis of newly discovered evidence or dismissal of the indictment on the ground of governmental misconduct. The allegedly newly discovered evidence consisted of more tapes of LeChasney and Agent Mullaney and a canceled check produced by Swindall. Once again, we reject Swindall's claim of prosecutorial misconduct without discussion. With respect to Swindall's *Brady* claims, we agree with the district court that the majority of the allegedly newly discovered evidence is either cumulative of evidence raised in Swindall's first post-trial motion or is cumulative of evidence actually introduced in the original trial. We thus affirm the district court's denial of Swindall's second post-trial motion.

## CONCLUSION

For the foregoing reasons, we REVERSE Swindall's convictions on Counts One, Nine, and Ten, and REMAND to the district court with instructions to VACATE the convictions and to DISMISS these counts with prejudice because of violations of the Speech or Debate Clause that occurred before the grand jury. We AFFIRM appellant's convictions on the remaining counts.

---

40. Swindall's allegations include reference to an October 2, 1987, surveillance tape in which Agent Mullaney and Swindall were discussing the promissory note that Swindall signed in exchange for the $150,000 check. According to the district court, Mullaney "laughingly" concluded, "This is a straight deal. This isn't the way it would have been if it was me." Swindall contends that this is proof that Agent Mullaney perjured himself when he stated that the $150,000 check was related to the $850,000 deal. We agree, however, with the district court that the government's explanation of the statement is more convincing:

[T]he evidence at trial showed that the deal under consideration by the defendant would be on two levels: one level was to assure Mike's investors that the defendant got the cash and signed a handwritten receipt in Mike's presence; the other level was to show a "straight deal" for defendant's protection. Therefore, Agent Mullaney in his undercover capacity was merely stating that LeChasney had achieved only Swindall's objective—to make the deal look like a "straight deal"—but had not achieved the agent's objective—to obtain a handwritten receipt acknowledging the actual deal.